UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2018-2
JUNE 11, 2019 SESSION



UNITED STATES OF AMERICA

v.  CRIMINAL NO. 2:18-cr-00151

18 U.S.C. § 1347
21 U.S.C. § 841(a)(1)
21 U.S.C. § 841(b)(1)(C)
21 U.S.C. § 856(a)(1)
18 U.S.C. § 1956(a)(2)(B)(i)
18 U.S.C. § 2

MUHAMMED SAMER NASHER-ALNEAM, M.D.

### T H I R D
### S U P E R S E D I N G
### I N D I C T M E N T

The Grand Jury Charges:

### COUNTS ONE THROUGH ELEVEN
### (Health Care Fraud – Office Visit Claims)

1.      Defendant MUHAMMED SAMER NASHER-ALNEAM (hereinafter "Defendant NASHER") was a medical doctor licensed to practice medicine in the State of West Virginia.

2.      Defendant NASHER owned, controlled, and operated a neurology and pain medicine practice located within the Southern District of West Virginia.  At all relevant times, Defendant NASHER was in charge of the day-to-day operation of the medical practice, and ultimately oversaw all medical decision making and all billing and business decisions.

3.      From in or about July 2013 through in or about February 2015, Defendant NASHER's medical practice, "Neurology & Pain Center, PLLC" was located at 401 Division Street, Suite 202, in South Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia. From in or about March 2015 through in or about February 2018,

Defendant NASHER's medical practice was located at 4501 MacCorkle Avenue SE, Suite A, in Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia. Defendant NASHER leased the office spaces described above, and was the only practicing physician at Neurology & Pain Center, PLLC.

4.    From in or about July 2013 to in or about February 2018, Defendant NASHER accepted several forms of payment, including cash, and health care benefit program reimbursements at his medical practice. In many instances, the payments and reimbursements were for distributing prescriptions for controlled substances.

5.    Defendant NASHER was assisted by individuals known and unknown to the Grand Jury in the day-to-day operation of his medical practice, including scheduling and conducting patient office visits, the preparation and distribution of prescriptions for controlled substances, the preparation and management of medical records, and the creation and submission of claims for reimbursement to Medicare and other health care benefit programs.

### The Controlled Substances Act

6.    In accordance with Federal law and regulations, the U.S. Drug Enforcement Administration ("DEA") separated drugs into groups, known as Schedules. Schedule II drugs, including oxycodone, opioids and synthetic opioids, were subjected to significant restrictions, due to the potential for abuse, which abuse may have led to severe psychological and physical dependence. Prescription drugs included in Schedules II, III, IV and V were commonly referred to as "controlled substances."

7.    In order to prescribe controlled substances a physician had to obtain a registration from the DEA and abide by all Federal laws and regulations concerning controlled substances.

8.    Defendant NASHER had an active DEA registration number that allowed him to

prescribe controlled substances, including Schedule II, III, IV and V controlled substances, so long as the prescription was for legitimate medical purposes in the usual course of his professional medical practice and within the bounds of medical practice.

9.      Under the Controlled Substances Act, Title 21, United States Code, Section 841(a) et seq., and Title 21, Code of Federal Regulations, Section 1306.04, a prescription for a controlled substance was not legal or effective unless issued for a legitimate medical purpose by a practitioner acting in the usual course of professional medical practice.

## Medicare Program

10.     The United States Department of Health and Human Services ("HHS") was an agency of the United States government.  The activities, operations, and obligations of HHS were funded with federal monies.   Among the programs the United States funded was the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. § 1395, et seq., commonly known as Medicare.

11.     Medicare Part B covered, among other things, physician services.

12.     The Secretary of HHS, through the Centers for Medicare and Medicaid Services ("CMS"), administered Medicare.  CMS contracted with private insurance carriers and fiscal intermediaries to administer and pay Part B claims from the Medicare Trust Fund, a reserve of monies provided by the federal government.

13.     Medicare provided free or below-cost health care benefits to eligible beneficiaries, primarily individuals who were at least 65 years of age or who had certain disabilities.  Medicare was a health care benefit program as that term is defined in 18 U.S.C. § 24.

14.     Enrolled providers of medical services to Medicare beneficiaries were eligible for reimbursement for covered medical services.

15.     By becoming an enrolled provider in Medicare, providers agreed to abide by the statutes, rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

16.     Enrolled Medicare providers were reimbursed for services provided to Medicare beneficiaries through the submission of paper claims or an electronic equivalent (all such submissions are referred to herein as "claims").

17.     The information in the claims submitted to Medicare included, but was not limited to, the name, address, and other identifying information of the Medicare beneficiary, the date on which the service was provided, a code or codes identifying the type and level of service provided, the charge for the service, a unique National Provider Identifier ("NPI") number, and other identifying information about the provider.

18.     At all pertinent times from in or about July 2013 through in or about February 2018, Defendant NASHER was enrolled as a Medicare provider.

**Medical Coding and Billing**

19.     Health care benefit programs, such as Medicare, paid for a service reportedly provided by a physician, based upon a claim for reimbursement submitted by the physician.

20.     Health care benefit programs, including Medicare, utilized a national correct coding practice for payment of claims that relied on the Current Procedural Terminology ("CPT") system, which was published in the American Medical Association's *Current Procedural Terminology* ("CPT Manual").  The CPT Manual included a listing of descriptive terms and identifying codes ("CPT Codes") for reporting medical services and procedures performed by providers.

21.     The CPT Manual included a series of codes for so-called evaluation and management services, which included codes for office visit services.

22.     With respect to office visit services, the CPT Manual contained codes for both new and established patients.  The CPT Manual defined office visit codes by three key components. These three components were history, examination, and medical decision making.  The office visit codes in the CPT Manual also indicated how much time a physician typically spent in face-to-face contact with a patient and/or the patient's family members for each of the various levels of office visit services.  The physician CPT codes for office visits with established patients were 99211 through 99215.

23.     CPT code 99211 was used for office visit services that were ordinarily rendered by a nurse or other auxiliary personnel.  CPT code 99211 was rarely, if ever, used for services rendered by a physician.  CPT codes 99212 through 99215 were reserved for office visit services rendered by licensed physicians and non-physician practitioners (e.g., physician assistants). Claims reporting a higher level office visit service (i.e. claims on which CPT codes 99213, 99214 and 99215 were reported) resulted in a higher rate of reimbursement than claims reporting a lower level of service (i.e. claims on which CPT codes 99211 and 99212 were used).

24.     In addition to addressing the key components of the office visit, the CPT Manual specified that a physician typically spent 10 minutes of face-to-face time with the patient when providing a service covered by 99212. Defendant NASHER rarely, if ever, submitted claims to Medicare or other health care benefit programs using CPT code 99212 to report a service that he purportedly rendered.

25.     In addition to addressing the key components of the office visit, the CPT Manual specified that a physician typically spent 15 minutes of face-to-face time with the patient when providing a service covered by 99213.

26.     In addition to addressing the key components of the office visit, the CPT Manual

specified that a physician typically spent 25 minutes of face-to-face time with the patient when providing a service covered by 99214.

27.     In addition to addressing the key components of the office visit, the CPT Manual specified that a physician typically spent 40 minutes of face-to-face time with the patient when providing a service covered by 99215.

### The Scheme

28.     From in or about July 2013 to in or about February 2018, Defendant NASHER, and others known and unknown to the grand jury, knowingly and willfully executed and attempted to execute the scheme described herein to defraud Medicare, a health care benefit program, and to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services in that Defendant NASHER caused Medicare to transmit health care benefit program funds to him by submitting materially false and fraudulent claims for office visit services that were not provided, were not conducted for legitimate medical purposes in the usual course of professional medical practice, and were beyond the bounds of medical practice.  The health care fraud scheme was developed and executed to support and conceal the prescribing of controlled substances that were not for legitimate medical purposes in the usual course of professional medical practice and were beyond the bounds of medical practice, and to increase the fees and revenue coming into the defendant's medical office.

29.     It was part of the scheme that Defendant NASHER saw established patients at his medical practice in the Southern District of West Virginia.

30.     It was further part of the scheme that Defendant NASHER knew that many

established patients visiting his medical practice were addicted to and physically dependent on controlled substances and were seeking controlled substances for other than legitimate and medically acceptable uses.

31.     It was also part of the scheme that Defendant NASHER scheduled established patient office visit appointments for the purpose of writing prescriptions for controlled substances that were not for legitimate medical purposes in the usual course of professional medical practice and were beyond the bounds of medical practice.

32.     It was an additional part of the scheme that Defendant NASHER scheduled appointments with addicted, physically dependent, and "drug seeking" patients, and wrote prescriptions for controlled substances for said patients, in order to be able to submit established patient office visit claims to Medicare and other health care benefit programs and to collect cash payments directly from patients.

33.     It was also part of the scheme that Defendant NASHER accepted cash payments from patients who were covered by health care benefit programs, including Medicare. Accepting cash payments from patients who were prescribed controlled substances, even though they were covered by a health care benefit program, was an indication or "red flag" that the patient was addicted to and physically dependent on controlled substances and "drug seeking."

34.     As part of the scheme Defendant NASHER regularly prescribed opioids and benzodiazepines to patients during the same office visit and contemporaneously. Opioids (a Schedule II controlled substance) and benzodiazepines (a Schedule IV controlled substance) were a drug combination often sought by individuals addicted to controlled substances. Regularly prescribing opioids and benzodiazepines was an indication and "red flag" that the prescribing was not for legitimate medical purposes in the usual course of professional medical practice and within

the bounds of medical practice.

35.     In furtherance of the scheme Defendant NASHER also routinely prescribed opioid dosages, quantities, and combinations having a high "morphine milligram equivalent." Repeatedly prescribing controlled substances having a high morphine milligram equivalent was an indication or "red flag" that the prescribing was not for legitimate medical purposes in the usual course of professional medical practice and was beyond the bounds of medical practice.

36.     It was also a part of the scheme that Defendant NASHER repeatedly failed to follow the standard of care applicable to physicians generally and neurologists specifically from in or about July 2013 to in or about February 2018.  In failing to adhere to the standard of care so frequently and across an extended period of time Defendant NASHER was not acting as a physician, but rather as a dealer of controlled substances.

37.     Federal regulations at 21 C.F.R. § 1306.05(a) required that all prescriptions for controlled substances must be dated as of, and signed on, the day issued.  It was part of the scheme that Defendant NASHER regularly pre-signed and pre-dated prescriptions so that they could be distributed to patients when he was absent from the office or unavailable.

38.     It was an additional part of the scheme that Defendant NASHER regularly scheduled and caused to be scheduled a high number of patient appointments in a day, making it impossible to provide established patient office visits for legitimate medical purposes in the usual course of professional medical practice and within the bounds of medical practice.  Furthermore, it was part of the scheme that Defendant NASHER routinely scheduled and caused to be scheduled patient appointments in increments of five minutes or less, making it impossible for him to provide established patient office visits for legitimate medical purposes in the usual course of professional medical practice and within the bounds of medical practice.

39.    Defendant NASHER regularly scheduled a large number of patients to be seen in a day in increments of five minutes or less because doing so maximized or increased the number of reimbursable patient encounters.

40.    It was further part of the scheme that Defendant NASHER recurrently disregarded or failed to utilize the results of "failed" urine drug screens which showed that patients to whom he was prescribing controlled substances were not using the drug or drugs he prescribed, using controlled substances or illicit drugs that the defendant had not prescribed, or both.  Failure to use a controlled substance prescribed by a physician and using controlled substances or illicit drugs that were not prescribed were indications or "red flags" that a patient was addicted to controlled substances, "drug seeking," diverting, and abusing controlled substances.  Defendant NASHER frequently chose not to counsel, warn, or discharge the patients who had one or more "failed" urine drug screens, and continued to prescribe controlled substances to them.

41.    As part of and in furtherance of the scheme, Defendant NASHER submitted materially false and fraudulent claims to Medicare and other health care benefit programs for office visit services that were not provided, and were not conducted for legitimate medical purposes in the usual course of professional medical practice and within the bounds of medical practice. Defendant NASHER did so knowing that health care benefit programs, such as Medicare, would not reimburse providers for office visit services that were performed for a purpose other than legitimate treatment or diagnosis, services that were not reasonable and necessary, and services that violated federal and state law.

42.    It was further part of the scheme that Defendant NASHER accepted payments from Medicare for office visit services that were not provided, or were not conducted for legitimate medical purposes in the usual course of professional medical practice and within the bounds of

medical practice.

43.     It was an additional part of the scheme that Defendant NASHER misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, acts done in furtherance of the scheme and the purposes of those acts.

44.     It was also part of the scheme that Defendant NASHER falsely documented established patient office visits by, among other things, documenting in the patient charts that he had performed physical examinations that were not done or were not rendered by him, and electronically copying entries from one date of service to transfer it to another encounter.  In so doing, Defendant NASHER concealed and hid acts done in furtherance of the scheme.

### Executions of the Health Care Fraud Scheme

45.     From in or about July 2013 to in or about February 2018, including but not limited to the dates set forth below, each such date constituting a separate count of this Third Superseding Indictment, in the Southern District of West Virginia and elsewhere, Defendant NASHER did knowingly and willfully execute and attempt to execute the above-described scheme to defraud Medicare in connection with the delivery of and payment for health care benefits, items, and services in that he caused Medicare to transmit health care benefit program funds to him in the approximate amounts set forth below by submitting materially false and fraudulent claims for office visit services that were not provided, were not conducted for legitimate medical purposes in the usual course of professional medical practice, and were beyond the bounds of medical practice:

| COUNT | ON OR ABOUT | CLAIM No. | LOCATION | PATIENT'S INITIALS | AMOUNT PAID |
|---|---|---|---|---|---|
| 1 | August 4, 2015 | 361116042167270 | Charleston | R.C. II | $78.35 |
| 2 | November 30, 2015 | 361116042167280 | Charleston | R.C. II | $78.35 |
| 3 | March 1, 2016 | 361116074164190 | Charleston | R.C. II | $77.44 |
| 4 | March 25, 2016 | 361116098176870 | Charleston | R.C. II | $77.44 |
| 5 | April 26, 2016 | 361116181196610 | Charleston | R.C. II | $77.44 |
| 6 | August 18, 2014 | 361114240228360 | South Charleston | A.J. | $78.61 |
| 7 | October 14, 2014 | 361114364171060 | South Charleston | A.J. | $78.61 |

| COUNT | ON OR ABOUT | CLAIM No. | LOCATION | PATIENT'S INITIALS | AMOUNT PAID |
|---|---|---|---|---|---|
| 8 | December 9, 2014 | 361114365140850 | South Charleston | A.J. | $78.61 |
| 9 | January 6, 2015 | 361115034135570 | South Charleston | A.J. | $14.42 |
| 10 | July 15, 2014 | 361114206162490 | South Charleston | S.S. | $53.08 |
| 11 | August 12, 2014 | 361114237155210 | South Charleston | S.S. | $53.08 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS TWELVE THROUGH FOURTEEN
### (Health Care Fraud Resulting In Death)

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 44 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.      It was part of the health care fraud scheme that on or about February 3, 2015, Defendant NASHER knowingly and intentionally distributed quantities of oxycodone and oxymorphone, both Schedule II controlled substances, to Patient A.J. during an office visit.  A claim that Defendant NASHER submitted to Medicare for the February 3, 2015 office visit was materially false because the office visit, along with the prescriptions issued to A.J. during the visit, were not for legitimate medical purposes in the usual course of professional medical practice, and were beyond the bounds of medical practice.

3.      It was part of the health care fraud scheme that on or about February 24, 2015, Defendant NASHER knowingly and intentionally distributed quantities of oxymorphone and oxycodone, both Schedule II controlled substances, to Patient A.J. during an office visit.  A claim that Defendant NASHER submitted to Medicare for the February 24, 2015 office visit was materially false because the office visit, along with the prescription issued to A.J. during the visit, were not for legitimate medical purposes in the usual course of professional medical practice, and were beyond the bounds of medical practice.  A.J. died on February 27, 2015 from oxycodone and oxymorphone intoxication.  A.J. would not have died but for the oxycodone and oxymorphone prescribed by Defendant NASHER.

4.      It was also part of the scheme that on or about September 9, 2014 Defendant NASHER knowingly and intentionally distributed a quantity of oxycodone, a Schedule II controlled substance, to Patient S.S. during and office visit.  A claim that Defendant NASHER

submitted to Medicare for the September 9, 2014 office visit was materially false because the office visit, along with the prescription issued to S.S. during the visit, were not for legitimate medical purposes in the usual course of professional medical practice, and was beyond the bounds of medical practice.  S.S. died on September 12, 2014.  S.S. would not have died but for the oxycodone prescribed by Defendant NASHER.

     5.     Defendant NASHER submitted claims to Medicare for the February 3, 2015 and February 24, 2015 office visits with A.J. and the September 9, 2014 office visit with S.S.

**Executions of the Health Care Fraud Scheme**

     6.     From in or about July 2013 to in or about February 2018, including but not limited to the dates set forth below, each such date or dates constituting a separate count of this Third Superseding Indictment, in the Southern District of West Virginia and elsewhere, Defendant NASHER did knowingly and willfully execute and attempt to execute the above-described scheme to defraud Medicare, in connection with the delivery of and payment for health care benefits, items, and services by causing Medicare to transmit health care benefit program funds to him, in that the defendant submitted materially false and fraudulent claims to Medicare for office visit services that were not provided, were not conducted for legitimate medical purposes in the usual course of professional medical practice, and were beyond the bounds of medical practice, resulting in the deaths of two patients identified below:

| COUNT | ON OR ABOUT | CLAIM Nos. | LOCATION | PATIENT INITIALS | DATE OF DEATH | AMOUNT PAID |
|---|---|---|---|---|---|---|
| 12 | September 9, 2014 | 361114275173460 | South Charleston | S.S. | September 12, 2014 | $78.61 |
| 13 | February 3, 2015 | 361115064114380 | South Charleston | A.J. | February 27, 2015 | $52.22 |
| 14 | February 24, 2015 | 361115076155750 | South Charleston | A.J. | February 27, 2015 | $52.22 |

     All in violation of Title 18, United States Code, Sections 1347 and 2.

13

## COUNTS FIFTEEN THROUGH TWENTY-FOUR
### (Health Care Fraud –Defendant's Absences From His Office)

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 44 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.      Defendant NASHER submitted claims to Medicare for "follow-up" office visit appointments that occurred while he was away from the office.  During these visits some patients saw a physician assistant employed by Defendant NASHER for the limited purpose of receiving a new prescription for a Schedule II drug.  The claims Defendant NASHER submitted to Medicare were materially false in two respects.

3.      All physicians enrolled with CMS and Medicare were assigned a unique National Provider Identifier ("NPI") number.  The NPI number was the means by which Medicare ascertained the identity of the medical provider who reportedly rendered the service included on a claim.  Non-physician practitioners, including physician assistants, could obtain their own unique NPI numbers.  Medicare reimbursements for claims submitted under a physician assistant's NPI number were paid to her physician employer.

4.      All of the physician assistants employed by Defendant NASHER had an NPI number.

5.      It was part of the scheme that Defendant NASHER arranged for patient appointments to be scheduled for days when he was away from his medical office and unable to see or examine patients himself and render any medical service.

6.      It was also part of the scheme that Defendant NASHER arranged for physician assistants to see patients for some or all of the scheduled appointments while he was absent from the office.  Defendant NASHER arranged for physician assistants to see patients during his

absences in order to satisfy the expectations of his patients that refill prescriptions for controlled substances would be issued, and to maintain the medical practice's revenue while he was away.

7.      It was an additional part of the scheme that Defendant NASHER pre-signed and pre-dated prescriptions for controlled substances, without examining or evaluating the intended recipient patients, so that his staff could distribute the prescriptions while he was away from the office. This conduct was in violation of 21 C.F.R. § 1306.05.

8.      On or about September 7, 2013, Defendant NASHER departed the United States, in route to Istanbul, Turkey. Defendant NASHER left Turkey and returned to the United States on or about September 22, 2013.

9.      As part of and in furtherance of the scheme a physician assistant saw patients while Defendant NASHER was in Turkey from September 7 to September 22, 2013. Nonetheless, Defendant NASHER submitted and caused to be submitted more than 100 claims to Medicare for these office visit encounters using his unique NPI. By using his own NPI number Defendant NASHER fraudulently represented to Medicare that he had provided the office visit services himself.

10.      On or about October 17, 2014, Defendant NASHER departed the United States, bound for Istanbul, Turkey. Defendant NASHER departed from Turkey and returned to the United States on or about October 30, 2014.

11.      As part of and in furtherance of the scheme a physician assistant saw patients while Defendant NASHER was in Turkey from October 17 to October 30, 2014. Nevertheless, Defendant NASHER submitted and caused to be submitted at least 120 claims to Medicare for these office visit encounters using his unique NPI. In using his own NPI number Defendant NASHER falsely represented to Medicare that he had provided the office visit services himself.

12.      On or about September 4, 2016, Defendant NASHER left the United States, bound for the United Arab Emirates.  Defendant NASHER did not leave the United Arab Emirates and return to the United States until on or about September 18, 2016.

13.      As part of and in furtherance of the scheme, a physician assistant saw patients while Defendant NASHER was in the United Arab Emirates from September 4 to September 18, 2016. Nonetheless, Defendant NASHER submitted and caused to be submitted at least 26 claims to Medicare for these office visit encounters using his unique NPI.  In using his own NPI number Defendant NASHER fraudulently represented to Medicare that he had provided the office visit services himself.

14.      The purpose of the office visits scheduled while Defendant NASHER was away from his office (i.e. from September 7 to September 22, 2013; October 17 to October 30, 2014; and September 4 to September 18, 2016) was for Defendant NASHER to evaluate the medical necessity of continuing to prescribe Schedule II controlled substances to his patients, and issue prescriptions for Schedule II drugs if appropriate.  However, Defendant NASHER did not see the patients because he was traveling outside of the United States and was, therefore, unavailable. During these patient encounters physician assistants distributed pre-signed and pre-dated prescriptions for Schedule II controlled substances to the patient, including prescriptions for oxycodone, morphine, and fentanyl.

15.      In accordance with 21 C.F.R. § 1306.03, a prescription for a controlled substance could only have been issued by an individual practitioner who was authorized to prescribe controlled substances by the jurisdiction in which she was licensed to practice her profession. Physician assistants licensed by the State of West Virginia were not permitted to prescribe Schedule II controlled substances or distribute prescriptions for Schedule II controlled substances.

16.     Because the purpose of the office visit services was to assess the medical necessity of continuing to prescribe Schedule II drugs to the patients, and issue the prescriptions if appropriate, the patient encounters that occurred from September 7 to September 22, 2013, October 17 to October 30, 2014, and September 4 to September 18, 2016 were beyond the scope of the licenses of the physician assistants.  In other words, the physician assistants were not authorized to prescribe or distribute the controlled substances by the State of West Virginia. For this reason, the patient encounters were not for legitimate medical purposes in the usual course of professional medical practice and were beyond the bounds of medical practice.

17.     Even if Defendant NASHER's physician assistants had been allowed to provide the follow-up office visit services during his absences, the claims submitted to Medicare were nonetheless materially false.

18.     Medicare regulations prohibited a physician from using his unique NPI to bill Medicare for services rendered by his physician assistant if the physician was not present in the office and available to provide direct supervision.  If the physician was absent from the office and unable to provide direct supervision, then he could nevertheless have submitted a claim to Medicare under the physician assistant's NPI.  However, use of the physician assistants NPI on the claim would have reduced the reimbursement from Medicare to 85% of the physician fee schedule amount for the service in question.  Stated another way, using a physician assistant's NPI in these circumstances would have resulted in Defendant NASHER receiving reduced reimbursements from Medicare.

19.     It was part of the health care fraud scheme that Defendant NASHER submitted claims to Medicare under his unique NPI, falsely representing that he had rendered the office visit services himself when, in fact, the services could not have been provided by him.

20.     It was also part of the scheme that Defendant NASHER caused patient records to be falsified to reflect that he had rendered the office visit services himself, even though he was, in fact, traveling outside of the United States.  It was an additional part of the scheme that Defendant NASHER falsely ratified the medical records by electronically signing his name to the progress notes and causing others to electronically sign his name on his behalf.

### Executions of the Health Care Fraud Scheme

21.     From in or about July 2013 to in or about February 2018, including but not limited to the dates set forth below, each such date constituting a separate count of this Third Superseding Indictment, in the Southern District of West Virginia and elsewhere, Defendant NASHER did knowingly and willfully execute and attempt to execute the above-described scheme to defraud Medicare, which was a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services in that he caused Medicare to transmit health care benefit program funds to him in the approximate amounts set forth below by pre-signing and pre-dating prescriptions and falsely claiming that he had provided services to patients at his office in the Southern District of West Virginia while he was absent for his office and traveling outside of the United States:

| COUNT | ON OR ABOUT | CLAIM No. | LOCATION | PATIENT'S INITIALS | AMOUNT PAID |
|---|---|---|---|---|---|
| 15 | September 7, 2016 | 361116263184150 | Charleston | T.M. | $104.96 |
| 16 | September 15, 2016 | 361116263184380 | Charleston | J.C. | $77.44 |
| 17 | September 7, 2016 | 361116263184130 | Charleston | R.Di. | $77.44 |
| 18 | September 15, 2016 | 361116263184030 | Charleston | J.M. | $77.44 |
| 19 | October 20, 2014 | 361114310156730 | South Charleston | D.H. | $53.08 |
| 20 | October 21, 2014 | 361114310156750 | South Charleston | H.A. | $53.08 |
| 21 | October 21, 2014 | 361114310156870 | South Charleston | P.W. | $53.08 |
| 22 | October 23, 2014 | 361114314191610 | South Charleston | G.D. | $53.08 |
| 23 | October 28, 2014 | 361114316200220 | South Charleston | R.Do. | $53.08 |
| 24 | October 28, 2014 | 361114316200190 | South Charleston | J.M. | $53.08 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS TWENTY-FIVE THROUGH THIRTY-FOUR
### (Illegal Drug Distributions)

1.       The Grand Jury realleges and incorporates by reference paragraphs 1 through 44 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.       On or about the dates set forth below, at or near the locations described below, in Kanawha County, West Virginia, within the Southern District of West Virginia, Defendant NASHER knowingly and intentionally distributed a quantity of a controlled substance, as identified in the chart below, not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice:

| COUNT | PATIENT INITIALS | DATE PRESCRIPTION ISSUED | LOCATION | CONTROLLED SUBSTANCE AND SCHEDULE |
|-------|------------------|--------------------------|----------|-----------------------------------|
| 25 | B.N. | 7/15/14 | South Charleston | Methadone, Schedule II |
| 26 | C.G. | 1/21/15 | South Charleston | Fentanyl, Schedule II, and Hydromorphone, Schedule II |
| 27 | C.G. | 4/28/15 | Charleston | Hydromorphone, Schedule II |
| 28 | R.C. | 3/25/16 | Charleston | Oxycodone, Schedule II |
| 29 | R.C. | 4/26/16 | Charleston | Oxycodone, Schedule II |
| 30 | J.S. | 9/2/16 | Charleston | Oxycodone, Schedule II |
| 31 | J.G.S. | 10/14/16 | Charleston | Oxycodone, Schedule II |

| 32 | O.S. | 11/9/16 | Charleston | Oxycodone, Schedule II |
| 33 | F.S. | 3/28/17 | Charleston | Oxycodone, Schedule II |
| 34 | J.E. | 7/6/17 | Charleston | Methadone, Schedule II |

All in violation of Title 21, United States Code, Section 841(a)(1).

## COUNTS THIRTY-FIVE THROUGH THIRTY-EIGHT
### (Illegal Drug Distributions)

1.     The Grand Jury realleges and incorporates by reference paragraphs 1 through 8 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.     On or about the dates set forth below, at or near the locations described below, in Kanawha County, West Virginia, within the Southern District of West Virginia, Defendant NASHER knowingly and intentionally distributed a quantity of a controlled substance, as identified in the chart below, not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice:

| COUNT | PATIENT INITIALS | DATE PRESCRIPTION ISSUED | LOCATION | CONTROLLED SUBSTANCE AND SCHEDULE |
|---|---|---|---|---|
| 35 | M.E. | 7/29/13 | South Charleston | Hydrocodone, Schedule III |
| 36 | M.E. | 8/20/13 | South Charleston | Hydrocodone, Schedule III |
| 37 | M.E. | 9/26/13 | South Charleston | Hydrocodone, Schedule III |
| 38 | M.E. | 10/22/13 | South Charleston | Oxycodone, Schedule II |

All in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT THIRTY-NINE
**(Distribution Causing Death)**

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 44 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.      On or about September 9, 2014, at or near South Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, Defendant NASHER knowingly and intentionally distributed a quantity of oxycodone, a Schedule II controlled substance, not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice, which distribution resulted in the death of patient S.S. from the subsequent use of the prescribed oxycodone.

In violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

## COUNTS FORTY AND FORTY-ONE
### (Distributions Causing Death)

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 44 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.      On or about the dates set forth below, at or near the locations described below, in Kanawha County, West Virginia, within the Southern District of West Virginia, Defendant NASHER knowingly and intentionally distributed quantities of oxycodone and oxymorphone, both Schedule II controlled substances, not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice:

| COUNT | PATIENT INITIALS | DATE PRESCRIPTION ISSUED | LOCATION | CONTROLLED SUBSTANCES AND SCHEDULE |
|---|---|---|---|---|
| 40 | A.J. | February 3, 2015 | South Charleston | Oxycodone, Schedule II, and Oxymorphone, Schedule II |
| 41 | A.J. | February, 24, 2015 | South Charleston | Oxycodone, Schedule II, and Oxymorphone, Schedule II |

3.      The distributions on February 3, 2015 and February 24, 2015 resulted in the death of patient A.J. from the subsequent use of the prescribed oxycodone and oxymorphone.

All in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

## COUNT FORTY-TWO
### (Maintaining a Drug Involved Premises)

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 8 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.      From in or about July 2013 through in or about February 2015, in South Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, Defendant NASHER knowingly and intentionally opened, leased, rented, used, and maintained office space at 401 Division Street, Suite 202, South Charleston, West Virginia, for the purpose of illegally distributing Schedule II and III controlled substances, including hydrocodone, oxycodone, oxymorphone, and methadone, not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice.

In violation of Title 21, United States Code, Section 856(a)(1).

## COUNT FORTY-THREE
### (Maintaining a Drug Involved Premises)

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 44 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.      From in or about March 2015 through in or about February 2018, in Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, Defendant NASHER knowingly and intentionally opened, leased, rented, used, and maintained office space at 4501 MacCorkle Avenue SE, Suite A, Charleston, West Virginia, for the purpose of illegally distributing Schedule II controlled substances, including oxycodone, not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice.

In violation of Title 21, United States Code, Section 856(a)(1).

## COUNTS FORTY-FOUR THROUGH FORTY-SEVEN
### (International Money Laundering)

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 44 for Counts One through Eleven of this Third Superseding Indictment as though fully set forth herein.

2.      On or about the dates set forth below, at or near the locations described below in Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere, Defendant MUHAMMED SAMER NASHER, M.D., knowingly transferred funds from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transfer represented the proceeds of some form of unlawful activity and in fact involved the proceeds of specified unlawful activity, that is, health care fraud in violation of 18 U.S.C. § 1347; knowingly and intentionally distributing Schedule II and III controlled substances, not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice in violation of 21 U.S.C. § 841(a)(1); and maintaining a drug involved premises in violation of 21 U.S.C. § 856 (a)(1).

3.      At the time the financial transactions described below occurred, Defendant MUHAMMED SAMER NASHER, M.D., knew the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activities.

4.      The transfer of funds in the financial transactions described below were the wire transfers of the amounts set forth below from a bank account in the United States, to a place outside the United States, as described below, each of which constitutes a separate count of this Third Superseding Indictment:

| COUNT | DATE | AMOUNT | LOCATION OF TRANSACTION | DESTINATION OF TRANSFER |
|---|---|---|---|---|
| 44 | 8/13/14 | $120,000 | South Charleston | Istanbul, Turkey |
| 45 | 11/12/14 | $50,000 | South Charleston | Istanbul, Turkey |
| 46 | 11/12/14 | $60,000 | South Charleston | Istanbul, Turkey |
| 47 | 2/2/17 | $59,000 | Charleston | Istanbul, Turkey |

All in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

## **NOTICE OF FORFEITURE**

1.      The allegations contained in Counts Twenty-Five through Forty-Seven of this Third Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 982(a).

2.      In accordance with 21 U.S.C. § 853(a) and Rule 32.2(a) of the Federal Rules of Criminal Procedure, and premised upon the conviction of Defendant NASHER of a violation of 21 U.S.C. §§ 801 et seq., Defendant NASHER shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses. The property to be forfeited includes, but is not limited to, the following:

   a.   The sum of $149,480.75, more or less, in United States currency constituting the balance of Account No. XXXXXX5821 in Branch Banking & Trust at the time of its seizure on or about February 22, 2018 (CATS ID No. 18-DEA-639659); and

   b.   The 2014 Acura RDX Sport Utility Vehicle, Vehicle ID Number 5J8TB4H32EL002708, seized on or about February 22, 2018 (CATS ID No. 18-DEA-639135).

3.      In accordance with 18 U.S.C. § 982(a) and Rule 32.2(a) of the Federal Rules of Criminal Procedure, and premised upon the conviction of Defendant NASHER of a violation of 18 U.S.C. § 1956(a)(2)(B)(i), as set forth in Counts Forty-Four through Forty-Seven of this Third Superseding Indictment, Defendant NASHER shall forfeit to the United States any property, real or personal, involved in the said offenses and any property traceable to property involved in the offenses. The property to be forfeited includes, but is not limited to, the following:

   c.   A money judgment in the amount of $289,000 which amount represents the gross proceeds involved in or traceable to property involved in the offenses set

forth in Counts Forty-Four through Forty-Seven of this Third Superseding Indictment.

4.      If any of the property described above in paragraph 2 of this Notice of Forfeiture, as a result of any act or omission of the Defendant:

    d.  cannot be located upon the exercise of due diligence;

    e.  has been transferred or sold to, or deposited with, a third party;

    f.  has been placed beyond the jurisdiction of the court;

    g.  has been substantially diminished in value; or

    h.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).

MICHAEL B. STUART
United States Attorney

By: _____

ALAN G. McGONIGAL
Assistant United States Attorney