**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**UNITED STATES OF AMERICA**

**v.** **CRIMINAL NO. 2:18-00151**

**MUHAMMED SAMER NASHER-ALNEAM, M.D.**

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on two motions in limine, one filed by defendant and the other filed by the United States. See ECF Nos. 238 and 247. Those motions are ripe for decision.

I. Background

Defendant Muhammed Samer Nasher-Alneam, M.D. ("Dr. Nasher) is a medical doctor licensed to practice medicine in the State of West Virginia. See ECF No. 223 at ¶ 1 (Third Superseding Indictment). From on or about July 2013 through February 2015, Dr. Nasher owned and operated a medical practice called "Neurology & Pain Center, PLLC," which, during that time, was located at 401 Division Street, Suite 202 in South Charleston, Kanawha County, West Virginia. Id. at ¶¶ 2-3. From about March 2015 through about February 2018, the defendant's medical practice was located at 4501 MacCorkle Avenue SE, Suite A, in Charleston, Kanawha County, West Virginia. See id. at ¶ 3. The defendant leased the office spaces described above and was the only practicing physician at Neurology & Pain Center, PLLC. See id. During the relevant time period, Dr. Nasher had an active

Drug Enforcement Administration (DEA) registration number that allowed him to prescribe controlled substances, including Schedule II, III, IV, and V controlled substances. See id. at ¶ 8.

On July 26, 2018, the grand jury returned a 15-count indictment against Dr. Nasher arising out of his activities in connection with Neurology & Pain Center, PLLC. See ECF No. 1. A second superseding indictment was returned on November 21, 2018, charging defendant with illegal drug distributions, in violation of 21 U.S.C. § 841(a)(1); illegal drug distributions resulting in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1); and international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(ii).

Trial on the second superseding indictment began on April 16, 2019. A mistrial was declared on May 7, 2019.

After the declaration of a mistrial, on June 12, 2019, Dr. Nasher was charged in a forty-seven count third superseding indictment charging him with various offenses related to operation of his medical practice. Specifically, defendant was charged with the following:

1) health care fraud, in violation of 18 U.S.C. § 1347 and § 2 (Counts One through Eleven and Fifteen through Twenty-four);

2) health care fraud resulting in death, in violation of 18 U.S.C. § 1347 and § 2 (Counts Twelve through Fourteen);

3) illegal drug distributions, in violation of 21 U.S.C. § 841(a)(1) (Counts Twenty-five through Thirty-eight);

4) illegal drug distributions resulting in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Counts Thirty-nine through Forty-one);

5) maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Counts Forty-two and Forty-three); and

6) international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(ii) (Counts Forty-four through Forty-seven).

See ECF No. 223. The court granted defendant's motion for judgment of acquittal as to the money laundering counts and the corresponding counts in the third superseding indictment were dismissed. See ECF No. 231.

There has been and continues to be considerable disagreement between the parties as to the evidence that is admissible in this case. That disagreement is highlighted in several motions currently pending before the court: 1) defendant's motion in limine to preclude the government from offering evidence of his overall practice; and 2) the government's motion in limine to prohibit defendant from offering evidence of his noncriminal conduct. (ECF Nos. 238 and 247). The government has stated that its decision to seek a third superseding indictment arose out of adverse evidentiary rulings in the prior trial that are addressed

in these motions in limine. <u>See</u> ECF Nos. 248 and 215-2. (noting that "its objective in seeking a third superseding indictment would be to address new circumstances occasioned by adverse evidentiary rulings during the trial of this case").

## <u>II. Legal Standards</u>

The touchstone for the admissibility of evidence is relevance. <u>See</u> Fed. R. Evid. 402 (Subject to certain limited exceptions, "[r]elevant evidence is admissible. . . Irrelevant evidence is not admissible."). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "The governing hypothesis of any criminal prosecution, for the purpose of determining relevancy of evidence introduced, consists of elements of the offense charged and any relevant defenses raised to defeat criminal liability." <u>United States v. Lamberty</u>, 778 F.2d 59, 60-61 (1st Cir. 1985). The "basic standard of relevance . . . is a liberal one." <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 587 (1993).

Federal Rule of Evidence 403 outlines several reasons which permit a court to exclude otherwise relevant evidence. According to that rule, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Because the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." United States v. Aramony, 88 F.3d 1369, 1378 (4th Cir. 1996).

## III. Discussion

Even a physician licensed under the Controlled Substances Act ("CSA" or "the Act") can be prosecuted under the Act. See United States v. Moore, 423 U.S. 122, 124 (1975) (holding "that registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice"); see also United States v. Tran Trong Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994) ("[A] licensed physician who prescribes controlled substances outside the bounds of his professional medical practice is subject to prosecution and is no different than a large-scale pusher.") (internal quotation and citation omitted). Of the government's burden of proof to convict a defendant under § 841(a)(1),

> the prosecution is obliged to prove "that (1) [the] defendant knowingly or intentionally distributed the controlled substance alleged in the indictment, and (2) at the time of such distribution the defendant knew that the substance distributed was a controlled substance under the law." United States v. Tran Trong Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994). An enhanced analysis applies, however, to persons who are properly

> registered with the DEA. Pursuant to 21 U.S.C. § 822, such persons—including doctors—are authorized to distribute controlled substances to the extent authorized by their registrations. . . .

United States v. Alerre, 430 F.3d 681, 689 (4th Cir. 2005). Therefore, in order to obtain a conviction of Dr. Nasher under 21 U.S.C. § 841(a)(1), the government must prove that he: (1) knowingly or intentionally distributed a controlled substance; (2) with knowledge that it was controlled under the law; and (3) that he did so "outside the usual course of professional practice." United States v. McIver, 470 F.3d 550, 556 (4th Cir. 2006) (quoting Moore, 423 U.S. at 124). "[A] doctor's good faith generally is relevant to a jury's determination of whether the doctor acted outside the bounds of medical practice or with a legitimate medical purpose when prescribing narcotics." United States v. Hurwitz, 489 F.3d 463, 476 (4th Cir. 2006).

With respect to a conviction under 21 U.S.C. § 856, the government must prove that Dr. Nasher: (1) opened, leased, rented, used, or maintained the premises identified in the indictment, either permanently or temporarily; (2) did so knowingly; and (3) did so for the purpose of illegally distributing the controlled substances identified in the indictment not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice. The government does not have to prove that illegal drug dealing was the sole purpose for which Dr. Nasher

maintained his medical practice. However, it must prove beyond a reasonable doubt that illegal drug dealing was a primary or principal reason the defendant maintained his medical practice. See Tr. 189-5; see also United States v. Russell, 595 F.3d 633, 644 (6th Cir. 2010).

In United States v. Robinson, 255 F. Supp. 3d 199, 201 (D.D.C. 2017), a case cited by defendant and relied on previously by the court, the defendant was charged with 61 counts of writing prescriptions for oxycodone outside the usual course of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1). Relying on Federal Rule of Evidence 403, the Robinson court prohibited the government from offering "evidence of Defendant's `practice as a whole[.]'" Id. at 202. The court found "that the probative value of this Rule 404(b) evidence is substantially outweighed by these dangers to the extent it implicates Defendant's entire practice (including some 1,800 patients). To allow the government to present evidence implicating hundreds of other patients and prescriptions would improperly overshadow the actual conduct charged in this case." Id. at 204-05 (emphasis in original). The Robinson court did not consider whether "overall practice evidence" would be admissible in a prosecution under 21 U.S.C. § 856 because no such charge was pending.

Robinson also moved to exclude evidence regarding patients not specifically named in the indictment. See id. at 201. The Robinson court permitted the government to introduce evidence of "a reasonable number" of patients not specifically named in the indictment. Id. at 203, 205 ("The Court finds that evidence of similar uncharged illegal drug prescribing activity is theoretically proper under Rule 404(b) because it tends to prove Defendant's intent and absence of mistake when he issued the charged prescriptions."). Citing Robinson, the court previously allowed evidence regarding patients not specifically named in the superseding indictment under Rule 404(b) with respect to the drug distribution counts. The court excluded evidence regarding defendant's practice as a whole. See ECF No. 139 at 2-3. However, the absence of § 856 charges in Robinson[1] limits the usefulness of that decision to this case.[2]

---

[1] See Robinson, 255 F. Supp.3d at 203 ("[T]he Court clarifies for the record that with respect to the counts brought under section 841, which relate only to 61 prescriptions issued to 11 patients, the government is not required to prove the nature of Defendant's overall practice.").

[2] If the two premises charges were not involved, the result might well be different. See, e.g., United States v. Ifediba, CASE NO. 2:18-CR-0103-RDP-JEO, 2019 WL 2578123, *2 (N.D. Ala. June 24, 2019) (granting motion in limine to prevent defendants charged in health care fraud and conspiracy to commit health care fraud from offering "evidence of good care and positive experiences of patients at [medical establishment] other than those instances specifically set forth in the Indictment"); United States v. Hung Thien Ly, No. 12-16580, 543 F. App'x 944, 946 (11th Cir. Nov. 4, 2013) (holding that "district court did not abuse its discretion in precluding [physician defendant] from

The two premises counts essentially charge defendant with running a pill mill from 2013 to 2018. And, as noted above, in order to obtain a conviction under § 856, the government must show that illegal drug dealing was a primary or principal reason for which the defendant established his medical practice. Therefore, evidence regarding the overall scope of defendant's medical practice is relevant to proving the elements of the crime, i.e., whether Dr. Nasher's alleged distribution of controlled substances not for a legitimate medical purpose was a "primary or principal" purpose for his medical practice. Accordingly, with respect to these two counts, evidence concerning defendant's overall practice is not Rule 404 evidence but, rather, evidence relevant to the charges. See United States v. Cole, 488 F. Supp.2d 792, 805 (N.D. Iowa 2007) (testimony from cooperating witness that "he observed the traffic coming and going from [defendant]'s residence is closely and inextricably intertwined with the charged crime of maintaining premises for drug crimes. . . . Indeed, such evidence goes to the heart of the issue of whether [defendant] knowingly opened, maintained, managed, controlled, and made available for use his residence for the purpose of unlawfully storing, distributing, and using crack

---

introducing evidence that he discharged other patients who allegedly violated his screening protocols. This evidence is not probative of his intent with respect to the patients who received drugs covered by the indictment.").

cocaine, all in violation of 21 U.S.C. § 856(a)(1) and (2), so that it is, in the court's view, `direct' evidence of the crime of maintaining premises for drug crimes.").

The government has to prove that the "primary or principal purpose" of defendant's medical practice was to unlawfully distribute controlled substances. To that end, overall practice evidence of the type the government seeks to introduce herein is widely used in prosecutions involving medical establishments under 21 U.S.C. § 856. See United States v. Li, NO. 3:16-CR-0194, 2019 WL 1126093, *2, 9-10 (M.D. Pa. Mar. 12, 2019) (admitting as evidence in prosecution against physician under 21 U.S.C. §§ 841(a)(1), 861(f), and 856(a)(1): the complete medical record of every patient in practice; testimony from nineteen former patients; testimony from eight pharmacists "regarding concerns with the frequency and strength of the prescriptions for opioids prescribed" by defendant; testimony from an expert who had reviewed the files of 60 patients although only 24 patients were named in indictment; PDMP data "for all prescriptions written by [defendant] from January 2011 through January 2015"; and ARCOS data from area pharmacies between 2011 and 2015); United States v. Singleton, 19 F. Supp.3d 716, 728 (E.D. Ky. 2014) (holding that "[t]estimony from employees, criminal informants, former employees, and law enforcement all supported a finding that [defendant] maintained [ ] clinics for the purpose

of dispensing controlled substances" where evidence demonstrated that defendant "was closely involved in overseeing the operations of the clinic, demanded the physicians increase their patient load, and set his own guidelines for the physicians with regard to prescribing medication"); United States v. Sadler, No. 1:10-CR-098, 2012 WL 3527084, *5 (S.D. Ohio Aug. 15, 2012) (holding that "[t]here was sufficient evidence to support the jury's conclusion that [defendants] were maintaining the clinic premises `for the purpose' of unlawfully dispensing and distributing controlled substances" where evidence included "mass-produced features of patient charts, the remarkable similarity of the regimen of drugs prescribed and dispenses to clinic clients, and the character of the clientele as described by neighboring tenants and by pharmacists who refused to fill their prescriptions"); see also United States v. Evans, 892 F.3d 692, 696-98 (5th Cir. 2018) (allowing overall practice evidence in prosecution for conspiracy to distribute controlled substances, in violation of 18 U.S.C. § 371, and distributing controlled substances without a legitimate medical purpose and outside the course of professional practice, in violation of 21 U.S.C. § 841, including: (1) testimony from neighboring establishment recounting a high number of out-of-state patients at defendant's practice, long lines at medical practice, and observation that defendant's patients acted like drug addicts, leading testifying

witnesses to suspect that defendant was running a "pill mill"; and (2) testimony from defendant's employee regarding how "practice worked" including how she (a medical assistant) "would fill out a prescription based on the patient's chart" and a system whereby which a patient could get 90 days of pills from only one office visit")

As to evidence regarding patients not specifically named in the indictment, that evidence is not 404(b) evidence but, rather, "intrinsic and relevant" with respect to the premises charges and, therefore, admissible. United States v. Li, NO. 3:16-CR-0194, 2019 WL 1126093, *11 (M.D. Pa. Mar. 12, 2019). As the Li court explained:

> Dr. Li insists that several witnesses were permitted to testify at his trial as Rule 404(b) witnesses. Specifically, Dr. Li notes that the Government presented testimony from several of Dr. Li's former patients at trial that he was not charged with individual counts of controlled substance distribution violations. In opposition, the Government asserts that Dr. Li fails to appreciate that he was charged in Counts 26 and 27 with maintaining drug involved premises. The Government concludes that the testimony offered by former patients that were not identified in the Superseding Indictment was not in fact Rule 404(b) evidence but was intrinsic and relevant to the drug involved premises charges. The Government is correct. Counts 26 and 27, as stated, charged Dr. Li with maintaining drug involved premises at his business offices. To prove that crime, the Government was required to establish, inter alia, that Dr. Li maintained those places for the purpose of distributing or dispensing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose. While several of Dr. Li's former patients [who] testified at trial were not named in individual counts in the Superseding Indictment,

> that testimony was pertinent to establishing that the distribution of controlled substance[s] was one of the primary or principal uses for which Dr. Li's offices were maintained. The testimony from any of Dr. Li's patients, including those not identified in the Superseding Indictment, was relevant to these charges.

Id.

Accordingly, courts have routinely not limited the introduction of such evidence. Cf. United States v. Gowder, No. 6:17-CR-25-REW-HAI, 2019 WL 112307, *6 (E.D. Ky. Jan. 2, 2019) (allowing evidence regarding deceased patients not charged in the indictment in prosecution for conspiracy to operate a pill mill);

Despite its request of the court to be permitted to offer evidence beyond the specific patients charged in the indictment, the government has filed a motion in limine seeking to prohbit defendant from doing the same thing. See ECF No. 247. In that motion, the government seeks the exclusion of any evidence offered by the defendant that "he purportedly (1) distributed controlled substances for legitimate medical purposes and within the bounds of a professional medical practice; (2) provided medically sound care to patients who are not the subject of the charges in the Third Superseding Indictment; or (3) submitted accurate and reimbursable claims to Medicare or other health care benefit programs." Id. at 1. Characterizing such evidence as "noncriminal conduct, or prior `good acts,'" the government argues that "[a]ny such evidence should be excluded, as it is irrelevant and could distract the jury from determining whether

the defendant illegally distributed controlled substances to the patients who are the subjects of specific counts in the indictment." Id. at 1-2. Apparently, the government wants to have it's cake and eat it too.

Just as it is clear that overall practice evidence and evidence related to patients not specifically named in the indictment is intrinsic to the premises charge, it is equally clear that it would be necessary for a physician defending such a prosecution to be able to offer evidence regarding the purpose of his practice.[3] The evidence offered by the physician defendant would almost certainly need to go beyond the evidence of the illegal distribution charges. See United States v. Li, NO. 3:16-CR-0194, 2019 WL 1126093, *3 (M.D. Pa. Mar. 12, 2019) (allowing physician defendant to offer testimony from former patients as well as his own testimony regarding the overall practice including "that he had approximately 2000 patients in his

---

[3] If the two premises charges were not involved, the result might well be different. See, e.g., United States v. Ifediba, CASE NO. 2:18-CR-0103-RDP-JEO, 2019 WL 2578123, *2 (N.D. Ala. June 24, 2019) (granting motion in limine to prevent defendants charged in health care fraud and conspiracy to commit health care fraud from offering "evidence of good care and positive experiences of patients at [medical establishment] other than those instances specifically set forth in the Indictment"); United States v. Hung Thien Ly, No. 12-16580, 543 F. App'x 944, 946 (11th Cir. Nov. 4, 2013) (holding that "district court did not abuse its discretion in precluding [physician defendant] from introducing evidence that he discharged other patients who allegedly violated his screening protocols. This evidence is not probative of his intent with respect to the patients who received drugs covered by the indictment.").

practice between 2010 and 2015 and that ninety percent of those patients were for pain management", "that he rejected 98 individuals as patients due to lack of records and that over 200 individuals were rejected after their records were reviewed", that "458 patients were discharged", and "of his approximate 1700 pain management patients, 204 were not prescribed opioids").

Of the types of evidence which a defendant might offer, the case of United States v. Evans is instructive. Although Evans did not involve a premises count, it did deal with a conspiracy prosecution. In that case, Evans was permitted to offer extensive overall practice evidence in his defense.

> "The defense case was that Evans ran a legitimate pain-management clinic. Through cross-examination of Government witnesses and calling former employees, Evans drew out the parts of his practice that did not involve prescribing drugs, the precautions his office took, and that many of his patients had suffered debilitating injuries and experienced real pain.
>
> Evans established that his practice involved more than pain-management patients. He still saw some car accident, workers' compensation, and cancer patients, as well as some patients requiring minor surgeries and seeking help with their weight. He was also certified to administer Suboxone, a medication designed to treat opioid addiction, and saw some patients suffering from addiction.
>
> To explain why his pain-management patients were driving the several hours from Louisiana to Houston, Evans established that the cost of appointments in Houston was lower. In 2008, Louisiana tightened its laws on pain medications, making it difficult for pain patients to see doctors and increasing the cost of doctors' visits. Texas, on the other hand, did not impose such hurdles, and Evans could charge low-income and uninsured patients substantially less.

Evans also drew out evidence about his clinic's practices and precautions. When a new pain-management patient came in, the patient would have to fill out paperwork, submit a recent MRI, and present a pharmacy printout of current prescriptions. To verify that the MRI was correct, a member of Evans's staff would call the MRI facility to make sure it was legitimate. If an MRI was confirmed as a fake, the patient's appointment would be cancelled. If an MRI was too old, Evans would order a new one.

Among the forms new patients had to sign were a patient contract and a pain-management agreement. Both agreements warned of the dangers of drug abuse and set forth general rules which, if violated, would result in the end of treatment. Under the agreements, patients were prohibited from "doctor shopping" (that is, visiting multiple doctors to obtain multiple prescriptions), "pharmacy shopping" (same idea as doctor shopping), selling their drugs, or using drugs at greater than the prescribed rate. Patients also promised to honestly communicate, submit to drug tests, and bring excess drugs on visits. Evans also used a prescription-drug-monitoring database to confirm that patients were not doctor shopping. Several patients' files reflected that they were discharged for violating these agreements. On top of these agreements, Evans had his patients perform two types of risk-assessment tests—the SOAPP and the COMM.

Evans also established that his pain management practice involved more than just churning out prescriptions. New pain-management patients were given brochures on the benefits of stretching and another on nonsurgical treatment for soft-tissue injuries. On visits, before a patient would see Evans, they would be weighed, have their blood pressure taken, and be shown exercises to help with their pain. Patients might then receive a massage, ultrasound, electric stimulation, or peg board (a device used to loosen tight muscles) treatment to help with the pain. Patients were also encouraged to do stretching at home and were given a journal to track their stretching. Patients would be asked to rate their pain, and the staff would keep track of it.

After all of these preparations, Evans would see the patient in an examination room. Evans called Rhoda

> Mann, his other assistant, to testify about what happened in the room. According to Mann, Evans would perform a physical examination, checking painful areas. Evans would then, according to Mann, decide whether to prescribe the patient a controlled substance. Mann admitted that most of the time, she would fill out the prescription and then have Evans sign it. On occasion, the assistant would retrieve a pre-signed prescription from Evans's safe. According to Mann, Evans would pre-sign prescriptions so that when he was out of town his patients would not go into withdrawal.

Evans, 892 F.3d at 700-02.

## IV. Conclusion

Based on the foregoing, defendant's motion in limine concerning "overall practice" evidence is **DENIED.** The government's motion in limine to prohibit defendant from offering evidence of his noncriminal conduct is also **DENIED.** Consistent with this Memorandum Opinion and Order, the parties will be permitted to offer relevant, noncumulative evidence regarding Dr. Nasher's overall practice and patients not specifically named in the indictment. With respect to the health care fraud scheme, the government may offer evidence of uncharged executions of that scheme. See United States v. Bajoghli, 785 F.3d 957, 963 (4th Cir. 2015) ("[W]hen the government charges a defendant under § 1347 with a scheme to defraud and elects to charge only some of the executions of that scheme, its election does ot limit its proof to only the charged executions. It may introduce other evidence of uncharged executions to prove the scheme.").

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record, to the United States Marshal for the Southern District of West Virginia, and to the Probation Office of this court.

**IT IS SO ORDERED** this 23rd day of July, 2019

ENTER:

David A. Faber
Senior United States District Judge