## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

**UNITED STATES OF AMERICA**

**v.**                                    **CRIMINAL NO. 2:18-00151**

**MUHAMMED SAMER NASHER-**
**ALNEAM, M.D.**

### MEMORANDUM OPINION

On July 22, 2019, the court held a hearing on defendant's motion to suppress.  (ECF No. 258).  Present at that hearing were the defendant, in person and by counsel, Isaac R. Forman, Michael B. Hissam, and Katherine B. Capito, and Assistant United States Attorneys Alan G. McGonigal, Jennifer Rada Herrald, and Steven I. Loew.  On the morning of July 23, 2019, in open court, the court granted defendant's motion insofar as it moved to suppress certain evidence related to Counts Fifteen through Twenty-Four of the Third Superseding Indictment.  This Memorandum Opinion sets out more fully the reasons for that ruling.

### Factual Background

Defendant Muhammed Samer Nasher-Alneam, M.D. ("Dr. Nasher) is a medical doctor licensed to practice medicine in the State of West Virginia.  See ECF No. 223 at ¶ 1 (Third Superseding Indictment).  From on or about July 2013 through February 2015, Dr. Nasher owned and operated a medical practice called "Neurology & Pain Center, PLLC," which, during that time, was located at 401 Division Street, Suite 202 in South Charleston,

Kanawha County, West Virginia.  Id. at ¶¶ 2-3.  From about March
2015 through about February 2018, the defendant's medical
practice was located at 4501 MacCorkle Avenue SE, Suite A, in
Charleston, Kanawha County, West Virginia.  See id. at ¶ 3.  The
defendant leased the office spaces described above and was the
only practicing physician at Neurology & Pain Center, PLLC.  See
id.  During the relevant time period, Dr. Nasher had an active
Drug Enforcement Administration (DEA) registration number that
allowed him to prescribe controlled substances, including
Schedule II, III, IV, and V controlled substances.  See id. at ¶
8.

On July 26, 2018, the grand jury returned a 15-count
indictment against Dr. Nasher arising out of his activities in
connection with Neurology & Pain Center, PLLC.  See ECF No. 1.  A
twenty-two count second superseding indictment was returned on
November 21, 2018, charging defendant with illegal drug
distributions, in violation of 21 U.S.C. § 841(a)(1); illegal
drug distributions resulting in death, in violation of 21 U.S.C.
§ 841(a)(1) and (b)(1)(C); maintaining a drug-involved premises,
in violation of 21 U.S.C. § 856(a)(1); and international money
laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(ii).

Trial on the second superseding indictment began on April
16, 2019.  After the jury was unable to reach a verdict on any of
the twenty-two counts, a mistrial was declared on May 7, 2019.

Defendant invoked his rights under the Speedy Trial Act and the retrial was scheduled for July 22, 2019

After the declaration of a mistrial, on June 12, 2019, Dr. Nasher was charged in a forty-seven count third superseding indictment charging him with various offenses related to operation of his medical practice.  Specifically, defendant was charged with the following:

1)   health care fraud, in violation of 18 U.S.C. § 1347 and § 2 (Counts One through Eleven and Fifteen through Twenty-four);

2)   health care fraud resulting in death, in violation of 18 U.S.C. § 1347 and § 2 (Counts Twelve through Fourteen);

3)   illegal drug distributions, in violation of 21 U.S.C. § 841(a)(1) (Counts Twenty-five through Thirty-eight);

4)   illegal drug distributions resulting in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Counts Thirty-nine through Forty-one);

5)   maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Counts Forty-two and Forty-three); and

6)   international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(ii) (Counts Forty-four through Forty-seven).[1]

See ECF No. 223.  The government maintains that its decision to seek a third superseding indictment arose out of adverse

_____

[1] On June 26, 2019, the court granted defendant's motion for judgment of acquittal made at trial as to the money laundering counts and the corresponding counts in the third superseding indictment were dismissed.  See ECF No. 231.

evidentiary rulings in the prior trial.  See ECF Nos. 248 and

215-2.  (noting that "its objective in seeking a third

superseding indictment would be to address new circumstances

occasioned by adverse evidentiary rulings during the trial of

this case").[2]  The health care fraud counts, Counts One to

Twenty-Four, are all new.

On the evening of July 15, 2019, less than a week before the

second trial was scheduled to begin, defendant filed the instant

motion to suppress.  Because of the looming trial date, the court

suggested scheduling a suppression hearing[3] for the morning of

July 22 and continuing the trial to the next day.  However, in

order to accommodate certain witness availability issues the

government would have if the trial were to be continued to July

23, the court held the suppression hearing the morning of July 22

and proceeded to jury selection that afternoon.

Defendant's motion to suppress was two-pronged.  First,

defendant argued that the search warrant was overbroad and that

the affidavit accompanying the application for the warrant

contained several false statements.  The court denied defendant's

_____

[2] The government also admitted that a new prosecutor was
assigned to the case, Mr. McGonigal, who "was tasked with
evaluating the case to identify options for redressing possible
deficiencies in the Second Superseding Indictment" after failing
to obtain a conviction on any of the 22 counts in the Second
Superseding Indictment.  ECF No. 248 at 2 n.2.

[3] There were also a number of other pretrial motions pending
that the court proposed to entertain at a hearing.

motion insofar as it alleged overbreadth and/or that the
legitimacy of the warrant was in question based upon alleged
misrepresentations in the affidavit.[4]

Defendant's second argument was that the government could
not rely upon the one and only search warrant in this case to
conduct searches in furtherance of its fraud investigation. <u>See</u>
ECF No. 258 at 4. According to defendant, "the government's
subsequent searches – in furtherance of its fraud investigation –
violate Rule 41(e)(2)(B)." <u>Id.</u> at 5. The government contends
that this argument fails because

> the information and evidence reviewed by the United
> States in formulating the Third Superseding Indictment
> was already in its possession as a result of the
> previously issued warrant and search. The health care
> fraud schemes now charged are directly related to and
> arise out of the § 841 charges that were the subject of
> the initial warrant. The evidence the United States
> seeks to introduce in the second trial of this matter
> includes information obtained within the scope of SA
> King's original affidavit and the warrant signed by
> Magistrate Judge Tinsley on February 21, 2018. The
> warrant's fourteen-day limitation in no way prevents
> the United States from analyzing or reviewing the
> evidence seized outside of that fourteen-day window.
> The defendant's argument to the contrary is meritless.

ECF No. 263 at 15.

After hearing the evidence at the suppression hearing,
reviewing the cases cited by the parties, and conducting its own
research, the court granted the motion to suppress as to evidence

---

[4] The specific reasons for that ruling will be set forth in
a separate document to be filed at a later date.

seized in support of the government's office absence health care fraud theory charged in Counts Fifteen through Twenty-Four. What follows are the court's findings of fact and conclusions of law.

**I.       The Search Warrant**

On February 21, 2018, FBI Special Agent Jennifer L. King applied for a warrant to search Dr. Nasher's medical office at 4501 MacCorkle Avenue SE for evidence of the commission of violations of 21 U.S.C. § 841(a)(1).  See ECF No. 258-1.  In support of its warrant application, the government relied on the affidavit of Agent King.  See id. (hereinafter "King Aff. at ¶__"); see also In the Matter of the Search of Business known as "Neurology & Pain Center, PLLC" located at 4501 Maccorkle Ave SE, Suite A, Charleston, Kanawha County, West Virginia, Case No. 2:18-mj-00021, ECF Nos. 3 and 10.  Agent King's affidavit and the application for a search warrant provided that there was probable cause to believe that a search would reveal evidence related to a violation of 21 U.S.C. § 841(a)(1), "distribution of controlled substances not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice."  See King Aff. at ¶¶ 2, 39; ECF No. 258-1 at 1.  The particular items to be seized were described as follows:

1.     Property that constitutes evidence of the commission of a criminal offense, specifically violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances not for legitimate medical purposes in the usual course of professional medical practice and beyond the

bounds of medical practice); and property designed
or intended for use or which is or have been used
as a means of committing said criminal offense;

2.      Patient files and medical charts for any patient
        who saw Dr. Nasher in 2013, 2014, 2015, 2016,
        2017, and/or 2018 (in whatever form, including
        electronic medical records and audio files); that
        is, 2013 - 2018 patient files/charts for patients
        within Dr. Nasher's practice, which files and
        charts are believed to contain evidence of the
        distribution of controlled substances, such as
        oxycodone or hydrocodone, Schedule II controlled
        substances, not for legitimate medical purposes in
        the usual course of professional medical practice
        and beyond the bounds of medical practice; and

3.      Documents and other items tending to establish or
        hide the whereabouts of proceeds and any items
        constituting proceeds from violations of 21 U.S.C.
        § 21 U.S.C. § 841(a)(1).

ECF No. 258-1 at 3.

        Of the electronic evidence to be seized, Agent King's

affidavit further provided:

        Based on the foregoing, and consistent with
        Federal Rule of Criminal Procedure 41(e)(2)(B), the
        warrant I am applying for would permit seizing,
        imaging, or otherwise copying storage media that
        reasonably appear to contain some or all of the
        evidence described in Attachment B, and would authorize
        a later review of the media or information consistent
        with the warrant.  The later review may require
        techniques, including but not limited to computer-
        assisted scans of the entire medium, that might expose
        many parts of a hard drive to human inspection in order
        to determine whether it is evidence described by the
        warrant.

King Aff. ¶ 35.

        United States Magistrate Judge Dwane L. Tinsley granted the

application, granted the government's motion to seal the

application and accompanying affidavit, and issued a search
warrant for Dr. Nasher's medical practice.  <u>See</u> ECF Nos. 2 and 4
in 2:18-mj-00021.  The search warrant does not mention health
care billing fraud or Dr. Nasher's absences from his office as
evidence of a crime.  Nor can health care billing fraud be
inferred from any of the underlying documents, including the
affidavit which does not mention it either.

## II.        Agent King's Testimony

At the suppression hearing, Agent King testified about the
execution of the search warrant.  <u>See</u> ECF No 278.  According to
her, paper patient files from the years 2013 to 2018 were seized
as well as the files of any known overdose victims.  <u>See</u> <u>id.</u> at
20.  In terms of seizing the electronic records of Dr. Nasher's
practice, Agent King stated that the server for the practice was
"imaged."  <u>See</u> <u>id.</u> at 22.[5]  Of efforts to segregate electronic
data that was responsive to the search warrant from data that was
nonresponsive, Agent King testified that there were no such
efforts.

> Q:   So if the entire server was imaged, what was done
>      to sort out documents that were responsive
>      included within the search as opposed to documents
>      that would have been nonresponsive and not within
>      the scope of the warrant?
>
> A:   I'm not really sure of the question.

---

[5] During the first trial, Agent King testified that Dr.
Nasher "kept all of his medical files electronically on something
called Practice Partner."  ECF No. 135 at 68.

Q:    If the warrant was limited, for example, to
      patients who had seen Dr. Nasher between 2013 and
      2018, what was done to limit the review of the - -
      if the entire server had been seized and imaged,
      what was done to sort out the contents of that
      server to be consistent with the scope of the
      warrant?

A:    Well, I was not able to review like medical files
      that were processed.  We chose our patients.  And
      then as we talked to Jamie Swartwood, she would
      pull those specific patients' files and those are
      the ones we reviewed.

Id.  Of the process for deciding which patient charts were pulled

for review, Agent King stated that a DOMEX analysis was used to

tell the government "what patient was getting high opioids, what

patient was getting benzos and opioids, and then we would have a

list of patients that way. . . .  Based on that, we were like,

hey, we want to look at A, B, and C.  And then they pulled up

medical files and we'd look at it."  Id. at 23-24.  Agent King

testified that somewhere between 19 and 50 or so patient files

were eventually pulled for review.  See id. at 25, 27.  According

to her, those charts were pulled somewhere between the execution

of the search warrant in February 2018 and the filing of the

first indictment.  See id. at 27-28.  Agent King further

testified that "[w]e might have extracted additional ones after

he was arrested."  Id. at 28.

     As for the timing of the search of medical records to

support the billing fraud charges, Agent King testified:

> Q:  Did you work with DOMEX on extracting any charts
>     during that time period on - - related to the
>     issue of billing fraud?
>
> A:  Billing fraud, no.  The billing fraud did not come
>     - - we weren't working on billing fraud at that
>     time.
>
> Q:  When did you start working on billing fraud?
>
> A:  After the trial.
>
> Q:  After the first trial?
>
> A:  Yes.

Id. at 28.  Agent King later qualified her answer.

> A:  You know what.  There was billing.  And Donna
>     Taylor of the West Virginia Insurance Commission
>     was working on a bunch of this stuff throughout
>     the case.  I'm sorry.  That - - let me correct
>     myself.
>
> Q:  Did Donna Taylor have any - - to your knowledge,
>     did Donna Taylor have any charts extracted by
>     DOMEX in connection with billing fraud?
>
> A:  That I don't know.

Id. at 28-29.

Regarding the issue of probable cause to search for evidence of billing fraud, Agent King admitted that the issue of billing fraud, specifically as it related to defendant's absences from his office, was never presented to Magistrate Judge Tinsley in obtaining a search warrant.  See id. at 30.

> Q:  Your affidavit to Magistrate Judge Tinsley, it
>     didn't contain any allegations of probable cause
>     as to billing fraud; correct?
>
> A:  There's nothing in it that contains that, no.

Q:   Right.  You didn't present anything on the issue
     of billing fraud to, to the magistrate?

[Objection]

                        * * *

Q:   On the issue of the defendant's absences from the
     office, the patients in these counts, Fifteen
     through Twenty-Four, did you present any
     allegations in your affidavit to Magistrate Judge
     Tinsley about the defendant's absences from the
     office?

A:   No.

Q:   Okay.  Do you know whether a second warrant was
     ever obtained on the issue of the defendant's
     absences from the office?

A:   From the office?  No, there was only one search
     warrant.

Q:   Okay.

                        * * *

A:   We did know about his travel prior to the trial.
     We did look into that.  So it wasn't just
     something that came up.  We were looking at it
     before.

Q:   And I was just trying to pin down that despite the
     fact that you may have known about it, it wasn't,
     it wasn't presented as part of the probable cause
     for the search warrant?

A:   No.

Id. at 30-31.

## III.    Jamie Swartwood's Trial Testimony

Jamie Swartwood, a Drug Enforcement Administration (DEA) IT

specialist, testified at Dr. Nasher's first trial.  See ECF No.

135 at 139-55.  Swartwood testified that she was "involved in the

extraction of files in this case." Id. at 140. After the search warrant was executed, Agent King provided a "forensic digital image of [Dr. Nasher's] IT systems" to her. Id. at 140-41. Of her role in searching for evidence, Swartwood testified "I was asked to export patient records, schedules, and to search for a specific patient." Id. at 141. Of the process for doing so, Swartwood further testified: "It's pretty straightforward. When you have the image of the computer, you basically just open the same software and you search for a patient. And the name - - the chart comes up. You export the patient charts. Very cut and dry." Id. at 142. Swartwood could not recall how many patient files she had retrieved. See id. at 144.

## IV.      Representations of the Attorneys

Once it became clear that Agent King did not have a full recollection of exactly what data was seized in the second search, counsel for defendant and the government conferred to clarify the record. Based upon those representations, the court finds that, prior to the first trial, Dr. Nasher's server was accessed to retrieve approximately 55 patient files (collectively "the first search"). See ECF No. 278 at 55-57. After the first trial and in connection with the billing fraud charges set forth in Counts Fifteen through Twenty-Four, twelve patient files and schedules were extracted from the server ("the second search"). See ECF No. 278 at 56-57; ECF No. 275-3; ECF No. 282 at 2-8.

12

Nine or ten of those twelve extracted patient files are for the individuals named in Counts Fifteen through Twenty-Four.  See id.[6]  The second search was to retrieve evidence solely related to the billing fraud/office absence charges in Counts Fifteen through Twenty-Four.  The government presented no evidence, through Agent King or otherwise, that it had considered, made any effort towards, or otherwise had been prepared to seek a second search warrant to search the records seized from Dr. Nasher's medical office to look for evidence related to the billing fraud scheme outlined in Counts Fifteen through Twenty-Four.

## V.       Legal Principles

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "The text of the Amendment thus expressly imposes two requirements.  First, all searches and seizures must be reasonable.  Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."  Kentucky v.

---

[6] Counts Eighteen and Twenty-Four both refer to a patient with the initials "J.M."  Only one patient file with those initials was retrieved during the second search.  Therefore, Counts Eighteen and Twenty-Four may involve the same patient.

<u>King</u>, 563 U.S. 452, 459 (2011) (citing <u>Payton v. New York</u>, 445
U.S. 573, 584 (1980)).  The particularity requirement "prevent[s]
a `general, exploratory rummaging.'"  <u>United States v. Oloyede</u>,
982 F.2d 133, 138 (4th Cir. 1993) (quoting <u>Coolidge v. New
Hampshire</u>, 403 U.S. 443, 467 (1971)).  "This [particularity]
requirement ensures that the search is confined in scope to
particularly described evidence relating to a specific crime for
which there is probable cause."  <u>Id.</u>; <u>see also</u> <u>Maryland v.
Garrison</u>, 480 U.S. 79, 84 (1987) ("The manifest purpose of this
particularity requirement was to prevent general searches.  By
limiting the authorization to search to the specific areas and
things for which there is probable cause to search, the
requirement ensures that the search will be carefully tailored to
its justifications, and will not take on the character of the
wide-ranging exploratory searches the Framers intended to
prohibit.").[7]  "[T]he ultimate touchstone of the Fourth Amendment

---

[7] Opposition to general warrants in America predates the
American Revolution and is one of the guiding principles of
individual freedom under our Constitution.  In an effort to
combat smuggling to avoid import tariffs, British colonial
governments issued general warrants, known as "writs of
assistance," that invested the bearer with power to compel any
local official to enter any property and make a general search
for contraband.  The writs of assistance case in colonial
Massachusetts, <u>Paxton's case</u> (1761), is said to have been "the
most important legal event leading up to the American
Revolution."  Presser and Zainaldin, <u>Law and Jurisprudence in
American History</u> 65 (6th ed. 2006).  According to John Adams,
"Then and there the child Independence was born."  <u>Id.</u>  While the
writ in <u>Paxton's case</u> was granted, the result only fueled growing
opposition to the practice of general searches, an opposition

14

is reasonableness." <u>Riley v. California</u>, 573 U.S. 373, 381-82 (2014) (quoting <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006)).

As noted above, the Fourth Amendment requires that a warrant identify the specific crime(s) thought to have been committed. <u>See</u> <u>Oloyede</u>, 982 F.2d 138; <u>see also</u> <u>United States v. Galpin</u>, 720 F.3d 436, 445 (2d Cir. 2013) ("First, a warrant must identify the specific offense for which the police have established probable cause"); <u>United States v. Castro</u>, 881 F.3d 961, 965 (6th Cir. 2018) ("A warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime."). Our appeals court has noted:

> The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant. . . .
>
> When a search is conducted pursuant to a warrant, it "is limited in scope by the terms of the warrant's authorization." <u>United States v. Phillips</u>, 588 F.3d 218, 223 (4th Cir. 2009); . . . But the terms of the warrant are not to be interpreted in a "hypertechnical" manner. <u>United States v. Robinson</u>, 275 F.3d 371, 380 (4th Cir. 2001). Rather, they should be read with a "commonsense and realistic" approach, to avoid turning a search warrant into a "constitutional straight jacket." <u>Phillips</u>, 588 F.3d at 223. . . .

_____

confirmed in countless cases subsequently decided in the United States.

15

United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010); see also Castro, 881 F.3d at 965 ("This interpretation also respects another imperative in reading warrants: They need not meet the rigors of Roget, Merriam, Webster, Strunk, and White. A common-sense contextual reading usually suffices, and usually gets the point the magistrate and officer sought to express.").

Courts have noted several additional considerations that should inform the Fourth Amendment analysis in the context of electronically-stored information. As one court explained:

> First, as the Second Circuit has recognized, "[w]here . . . the property to be searched is a computer hard drive, the particularity requirement assumes even greater importance." Galpin, 720 F.3d at 446. That is because the "seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure." United States v. Ganias, 824 F.3d 199, 217 (2d Cir. 2016) (en banc). As such, "[t]he potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous"—a "threat [that] is compounded by the nature of digital storage." Galpin, 720 F.3d at 447. Indeed, the Government, once it has obtained authorization to search a hard drive, may in theory "claim that the contents of every file it chose to open were in plain view and, therefore, admissible even if they implicate the defendant in a crime not contemplated by the warrant," thus presenting a "`serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant.'" Id. (quoting United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam)); cf. Riley v. California, ―― U.S. ――, 134 S. Ct. 2473, 2489-91, 189 L. Ed. 2d 430 (2014) (recognizing that cell phones "differ in both a quantitative and qualitative sense from other objects

that might be kept on an arrestee's person" owing to their "immense storage capacity" and their ability to "contain[] in digital form" both "many sensitive records previously found in the home" and "a broad array of private information never found in a home in any form—unless the phone is"); <u>Ganias</u>, 824 F.3d at 231 (Chin, J., dissenting) (noting that "[v]irtually the entirety of a person's life may be captured as data" on a computer or smartphone). Accordingly, a "heightened sensitivity to the particularity requirement in the context of digital searches" is necessary." <u>Galpin</u>, 720 F.3d at 447.

There is also the matter of the execution of a warrant targeting electronically stored information. Under Federal Rule of Criminal Procedure 41(e)(2)(B), a warrant may—as the Warrants at issue did here— "authorize the seizure of electronic storage media or the seizure or copying of electronically stored information." Fed. R. Crim. P. 41(e)(2)(B). The Rule provides that "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." <u>Id.</u> Although "there is no established upper limit as to when the government must review seized electronic data to determine whether the evidence falls within a scope of the warrant," courts have recognized that "the Fourth Amendment requires the government to complete its review, i.e., execute the warrant, within a `reasonable' period of time." <u>Metter</u>, 860 F. Supp. 2d at 215 (collecting cases); <u>see also</u> <u>United States v. Alston</u>, 15-cr-435, 2016 WL 2609521, at *3 (S.D.N.Y. Apr. 29, 2016) ("While Rule 41 prescribes no particular time period for data extraction in these circumstances, the time needed to complete off-site copying or review is subject to the rule of reasonableness."); <u>Lustyik</u>, 57 F. Supp. 3d at 230 ("[l]ike all activities governed by the Fourth Amendment, the execution of a search warrant must be reasonable" and "[l]aw enforcement officers therefore must execute a search warrant," including when applicable review of recovered electronic communications, "within a reasonable time"); <u>cf. In the Matter of a Warrant for All Content and Other Information Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled by Google, Inc.</u>, 33 F. Supp. 3d 386, 392 (S.D.N.Y. Aug. 7, 2014) (noting that courts have developed a "flexible approach" for assessing the execution of warrants for

electronic evidence, applying a general standard of
"reasonableness") (internal quotation marks omitted).

United States v. Wey, 256 F. Supp. 3d 355, 383-82 (S.D.N.Y.
2017).

As the foregoing makes clear, it is imperative that searches
of electronic information strictly comply with the parameters
outlined in the warrant to avoid effectively converting a search
warrant supported by probable cause into the sort of general
warrant forbidden by the Fourth Amendment.  See United States v.
Mann, 592 F.3d 779, 786 (7th Cir. 2010) ("[W]e simply counsel
officers and others involved in searches of digital media to
exercise caution to ensure that warrants describe with
particularity the things to be seized and that searches are
narrowly tailored to uncover only those things described.";
United States v. Schlingloff, 901 F. Supp. 2d 1101, 1105 (C.D.
Ill. 2012) ("The promise of the Fourth Amendment to be free from
unreasonable searches and seizures contemplates a warrant that
sets forth with specificity the area to be searched and the
subject matter of the search.  So if a warrant authorizes an
officer to look in all files on a computer, should the courts
care how it is done?  This Court believes so.").

Against this backdrop, the court considers the government's
actions in this case.  The question this court must answer is
whether the government's second search of Dr. Nasher's records—-
occurring approximately 15 months after the records were seized

and after Dr. Nasher had already gone to trial once—-to retrieve evidence to support its new claims of health care billing fraud outlined in Counts 15 through 24 exceeded the scope of the warrant issued on February 21, 2018.  The court finds that it did and that the government's actions in this regard were not reasonable under the Fourth Amendment.

**VI.      Wey and Loera**

Two recent cases proved especially helpful to the court in resolving the suppression motion.  The first of these, United States v. Wey, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), was cited by defendant in his suppression motion.

In Wey, the FBI sought warrants to search defendant's business office and residence.  See id. at 361-66.  The FBI Agent's Affidavits in support of the applications for the warrants "asserted that there was probable cause to believe that fruits, instrumentalities, and evidence of violations of the federal securities, mail, and wire fraud laws were located within the scope of the premises."  Id. at 361, 363.  The applications were approved and search warrants were issued on January 24, 2012, and January 25, 2012.  See id. at 363-66.  Materials to be seized included, among other things, "[c]omputers, flash drives, internal and external hard drives, diskettes and other magnetic storage media, and files, data and information contained thereon.

. . ." <u>Id.</u> at 364. The searches of Wey's business office and home were executed on January 25, 2012. <u>See</u> <u>id.</u> at 368-73.

A number of electronic devices and computer equipment were seized from both the business and the residence, either by copying the device in its entirety onsite or taking the original device. <u>See</u> <u>id.</u> at 370, 373. A review of the electronic data seized was completed by the FBI in early September 2013 and copies of all documents deemed pertinent were provided to the prosecution team. <u>See</u> <u>id.</u> at 377. The government did not confine its search to evidence related to the offenses discussed in the affidavits. <u>See</u> <u>id.</u> at 377, 405. Also, "[i]n the weeks leading up to Wey's indictment . . . FBI personnel conducted additional searches across all electronic materials recovered from both locations." <u>Id.</u> at 377.

The court granted Wey's motion to suppress based upon its conclusion that the warrants lacked particularity and were overbroad. <u>See</u> <u>id.</u> at 410-11. In determining that the government agents in that case had not acted in good faith, the <u>Wey</u> court made several observations that are particularly pertinent in this case:

> This case presents still another factor . . . for
> evaluation in determining the Government's level of
> culpability and, correspondingly, its susceptibility in this
> context to deterrence. And it is one worth emphasizing:
> belying any argument that it sought to limit executions of
> the Warrants according to the parameters of the
> applications, the Government evinced no hesitation to
> subject the electronic Search fruits to continuing and, at

least to some extent, expanding searches as its
investigation and charging theories developed over the
months and years following the initial Searches and
preceding Wey's indictment.

As discussed above, AUSA Massey and Agent McGuire
candidly testified at the Hearing that they had no
qualms, for example, about searching the electronically
stored evidence—well over a year after the Searches and
prior to any sorting for pertinence—for evidence of tax
evasion, an "alternative" charging theory not discussed
in the Affidavits, apparently not developed until after
McGuire took over as case agent well after the
Searches, and never presented to a judge.  Similarly,
they considered it within their authority to search the
unsorted electronic materials for documents pertaining
to a number of individuals and entities not identified
or discussed in the Warrants or the applications but
whose potential relevance to the ongoing investigation
became increasingly apparent sometime after the
Searches concluded.

The Government maintains that this approach to
reviewing the electronic evidence was entirely
appropriate so long as its novel search terms were
designed to identify documents that would otherwise
fall within the Warrants' (inappropriately expansive
terms). . . .

* * *

Wey argues that this conduct is independently
violative of the Fourth Amendment.  It may be.
Regardless, the Court finds that, if nothing else, it
constitutes further evidence of the agents' culpability
in making affirmative choices to treat the Warrants as
though they were the functional equivalent of general
warrants.  Such conduct can and should be deterred.

* * *

Furthermore, the Government cites, and the Court
is aware of, no authority suggesting that simply
because it has retained all originally searchable
electronic materials, the Government is permitted to
return to the proverbial well months or years after the
relevant Warrant has expired to make another sweep for

relevance, armed with newly refined search criteria and novel case theories.

* * *

For the Government to skirt that new warrant obstacle here by—appearances would suggest—intentionally taking advantage of its sweeping electronic take to look for evidence in an essentially analogous manner is inconsistent, in the Court's view, with a claim to good faith in executing the Warrants.

* * *

[N]othing . . . permits the Government to sit on eighteen terabytes of data for years after the expiration of the authorizing warrant and intentionally mine it with searches targeting individuals and charging theories absent from the warrant application but identified as relevant by post-search developments in the Government's investigation.

* * *

Interpreting and executing their authority expansively—in keeping, the evidence suggests, with the intention of the drafters—the agents treated the Warrants both during and after the physical Searches as, for all intents and purposes, general warrants.

Id. at 405-08.[8]

---

[8] The government argued that Wey was distinguishable because the court in that case was concerned with a later search of materials previously deemed nonresponsive. See ECF No. 263 at 14; ECF No. 278 at 54. The government is correct that the Wey court found especially troubling the government's searches in 2015 covering all documents in the FBI's database, including those that had been sorted out years earlier. See Wey, 256 F. Supp. 3d at 406. However, as noted above, the court was also bothered by the government's searches prior to any sorting "for evidence of tax evasion, an `alternative' charging theory not discussed in the Affidavits, apparently not developed until [another agent] took over as case agent well after the Searches, and never presented to a judge." Id. at 405.

A recent case from the United States Court of Appeals for the Tenth Circuit, United States v. Loera, 923 F.3d 907, 916-17 (10th Cir. 2019), explained that an ex post assessment of the propriety of a government's search is essential to ensuring that the Fourth Amendment's protections are realized when searches of electronic data are involved.  According to the court:

> Determining whether a search exceeds the scope of the authorizing warrant is, like most inquiries under the Fourth Amendment, an exercise in reasonableness assessed on a case-by-case basis.  Dalia v. United States, 441 U.S. 238, 258, 99 S. Ct. 1682, 60 L. Ed. 2d 177 (1979) (holding that the manner of a search is subject to "later judicial review as to its reasonableness").  The general Fourth Amendment rule is that investigators executing a warrant can look anywhere where evidence described in the warrant might conceivably be located.  United States v. Ross, 456 U.S. 798, 824 (1982).
>
> * * *
>
> This limitation works well in the physical search context to ensure that searches pursuant to warrants remain narrowly tailored, but it is less effective in the electronic-search context where searches confront what one commentator has called the "needle-in-a-haystack" problem.  Orin S. Kerr, Digital Evidence and the New Criminal Procedure, 105 Colum. L. Rev. 279, 301 (2005).  Given the enormous amount of data that computers can store and the infinite places within a computer that electronic evidence might conceivably be located, the traditional rule risks allowing unlimited electronic searches.
>
> To deal with this problem, rather than focusing our analysis of the reasonableness of an electronic search on "what" a particular warrant permitted the government agents to search (i.e., "a computer" or "a hard drive"), we have focused on "how" the agents carried out the search, that is, the reasonableness of the search method the government employed.

<u>Id.</u> at 916-17.

In <u>Loera</u>, the court held that a second search of the defendant's electronic data, pursuant to a warrant to search for evidence of computer fraud, was unreasonable because it was directed at uncovering evidence of child pornography. <u>See id.</u> at 922 ("Loera accepts that the first warrant permitted the government to seize the four CDs that were found to contain some child pornography and to search the for evidence of computer fraud. Therefore, Loera challenges Cravens' November 27 search only for exceeding that permission. Accordingly, we confine our analysis to whether the second search exceeded the scope of the first warrant. The district court concluded that it did and that neither exigent circumstances nor any other exception to the warrant requirement justified that search. We agree. . . ."). Of particular importance to the court's ruling was the district court's finding that the police officer was not searching for evidence of computer fraud. <u>See id.</u> Accordingly, the court found that the search was unlawful because it exceeded the scope of the warrant. <u>See id.</u> at 924.

**VII.      The Government Exceeded the Scope of the Warrant**

Under the Fourth Amendment, when law enforcement personnel obtain a warrant to search for a specific crime but later, for whatever reason, seek to broaden their scope to search for evidence of another crime, a new warrant is required. <u>See</u> <u>United</u>

States Mann, 592 F.3d 779, 786 (7th Cir. 2010) (finding "troubling" detective's "failure to stop his search and request a separate warrant for child pornography" where, during search seeking to uncover evidence of voyeurism under lawful warrant, detective discovered child pornography).  Government agents routinely do just that.  See, e.g., United States v. Williams, 592 F.3d 511, 516 n.2 (4th Cir. 2010) (obtaining a second search warrant specifically to authorize a search for child pornography where FBI agent, conducting search under state warrant for evidence related to Virginia crimes of threatening bodily harm and harassment by a computer, observed evidence of child pornography); United States v. Giberson, 527 F.3d 882, 890 (9th Cir. 2008) (government only searched computer for pornographic files after obtaining third search warrant allowing it to search for child pornography); Triplett v. United States, No. 1:09cr154-MPM, 2014 WL 3756353, *1 (N.D. Mass. July 30, 2014) ("[A] search warrant was issued for items at the Morris-Triplett residence that could lead to information about Kaila's disappearance. . . . Several computers were seized from the home, and a forensic examination of the computers was conducted.  After a forensic examination revealed images of what the investigator believed to be child pornography, the investigator ceased his examination and called the Sheriff's Department to advise them to apply for another search warrant.  A second search warrant was obtained,

and over 4,000 images of child pornography were located on the computers."); <u>United States v. Carter</u>, Criminal No. 09-161, 2012 WL 604162, *4-5 (W.D. Pa. Feb. 24, 2012) (computer search for evidence of counterfeiting halted to obtain second search warrant to look for child pornography when evidence of child pornography found); <u>United States v. Gray</u>, 78 F. Supp. 2d 524, 527-28 (E.D. Va. 1999) (upon discovering child pornography while conducting computer search for evidence of unauthorized computer intrusions as authorized by search warrant, agent stops search and obtains a second warrant authorizing search for child pornography).

Indeed, guidance from the Department of Justice counsels that "it remains prudent to seek a second warrant upon discovering evidence of an additional crime not identified in the initial warrant."  U.S. Dep't of Justice, <u>Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations</u> 91 (2009).  That guidance further provides:

> **Changes of Focus and the Need for New Warrants**:  A single computer can be involved in several types of crimes, so a computer hard drive might contain evidence of several different crimes.  When an agent searches a computer under the authority of a warrant, however, the warrant will often authorize a search of the computer only for evidence of certain specified crimes.  If the agent comes across evidence of a crime that is not identified by the warrant, it may be a safe practice to obtain a second warrant.

<u>Id.</u> at 90.

And, when they fail to do so, evidence outside the scope of the original warrant is subject to exclusion.  <u>See, e.g.,</u> <u>United</u>

States v. Carey, 172 F.3d 1268, 1276 (9th Cir. 1998) (suppressing child pornography evidence where police, conducting search under warrant for drug offenses, continued to search for child pornography without obtaining warrant); United States v. Hulscher, 4:16-CR-40070-01-KES, 2017 WL 657436, *2 (D.S.D. Feb. 17, 2017) (suppressing evidence from second search of Iphone for evidence to support federal firearms charges where search warrant allowing seizure and search of phone was to investigate forgery, counterfeiting, and identify theft offenses because agent "should have applied for and obtained a second warrant [that] would have authorized him to search Mr. Hulscher's cell phone data for evidence of firearms offenses"); United States v. Schlingloff, 901 F. Supp. 2d 1101, 1106 (C.D. Ill. 2012) (concluding scope of search warrant was exceeded and suppressing evidence of child pornography where law enforcement agent was searching computer for evidence of passport fraud and identify theft but, upon covering evidence of child pornography, failed to seek a second warrant).

According to the government, because the electronic records were lawfully seized in the first place "there's no problem and no limitation to go back and look at them later." ECF No. 278 at 37. The court disagrees. Even when a seizure of electronic data is legal, any search of that data must be within the scope of the warrant. Cf. United States v. Wardle, No. 2:12-CR-73-DB, 2013 WL

3776267, *5 (D. Utah July 17, 2013) (rejecting government's argument that second search of defendant's hard drives "was merely a subsequent search pursuant to the initial warrant" where second search was "for the purpose of obtaining documents related to a different individual in response to discovery obligations in a different case").

In this case, the government exceeded the scope of the search warrant which authorized a search of defendant's electronic data for evidence of violations of the Controlled Substances Act. See Horton v. California, 496 U.S. 128, 140 (1990) ("If the scope of the search warrant exceeds that permitted by the terms of the validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more."). Therefore, the government should have gotten a second warrant to conduct its search for evidence of healthcare billing fraud.[9] There was no impediment to doing so as the government was "not in a rapidly unfolding situation or searching a location where evidence was likely to move or change, [and] there was no

_____

[9] The court finds the government's argument that the second search was directly related to its investigation into drug dealing unpersuasive. It is clear that the government's focus in searching Dr. Nasher's records a second time was to build a billing fraud case based upon his office absences. And, unlike the other health care fraud counts unaffected by this ruling, the indictment does not charge Dr. Nasher with violating 21 U.S.C. § 841 with respect to those patients.

downside to halting the search to obtain a second warrant."
Mann, 592 F.3d at 786; see also Schlingloff, 901 F. Supp. 2d at
1105 ("[I]t is also important to note that there is normally no
fear of degradation or dissipation of evidence or a rapidly
evolving situation requiring the need to `shoot from the hip' in
examining seized computer files without a proper warrant").

## VIII.    The Exclusionary Rule

A violation of the Fourth Amendment does not automatically
trigger the application of the exclusionary rule.  Herring v.
United States, 555 U.S. 135, 141 (2009) ("We have repeatedly
rejected the argument that exclusion is a necessary consequence
of a Fourth Amendment violation.").  The court must determine
"the efficacy of the rule in deterring Fourth Amendment
violations in the future."  Id.  The court must weigh the
benefits of applying the rule against its costs.  See id.  When
weighing these competing values, the balance in this case tips
toward excluding the evidence obtained from the second search.

As the Court stated:

> [T]he benefits of deterrence must outweigh the costs. .
> . .  We have never suggested that the exclusionary rule
> must apply in every circumstance in which it might
> provide marginal deterrence. . . .  To the extent that
> application of the exclusionary rule could provide some
> incremental deterrent, that possible benefit must be
> weighed against its substantial costs. . . .  The
> principal cost of applying the rule is, of course,
> letting guilty and possibly dangerous defendants go
> free - - - something that offends basic concepts of the
> criminal justice system.

Id. at 141 (internal citations and quotations omitted).

In this case, the cost of applying the exclusionary rule is minimal for a couple of reasons.  First, even if the government decided it could not go forward with the ten counts affected by this ruling, Dr. Nasher still remains subject to prosecution for 33 other offenses, several of which carry the potential for a sentence of life imprisonment.  Therefore, there is no danger that a dangerous and guilty defendant will go free.  On the other hand, Counts Fifteen through Twenty-Four carry a statutory maximum of ten years.  However, any actual sentence imposed if just those ten counts were involved would be far less.  See United States Sentencing Commission, Guidelines Manual, § 2B1.1 Nov. 2018).  Second, the court is not convinced that the government could not go forward on those counts even without the evidence subject to suppression.

Finally, the need for deterring future similar conduct is significant in this case.  Given the heightened potential for government abuse of stored electronic data, it is imperative that courts ensure that law enforcement scrupulously contain their searches to the scope of the search warrant which permitted the search in the first place.  This is especially true where, as here, the illegal search was conducted at the behest of lawyers–the people in the best position to know what was allowed under the law.  See, e.g., Hulscher,  2017 WL 657436 at *4 ("If

the exclusionary rule is not applied, law enforcement agencies will have carte blanche authority to obtain a warrant for all data on a cell phone, keep the unresponsive data forever, and then later use the data for criminal prosecutions on unrelated charges—-erasing the protections specifically contemplated in Riley."); Schlinghoff, 901 F. Supp. 2d at 1106 (suppressing evidence where search exceeded scope of warrant because "[a]ny other outcome would be contrary to the intent of the Fourth Amendment that search warrants must describe with particularity the things to be seized, so that a search for specified evidence does not devolve into a generalized search for something entirely different").

## IX.        Good Faith Exception

The government has argued that the good-faith exception to the exclusionary rule should apply.  In United States v. Leon, 468 U.S. 897, 922-23 (1984), the Supreme Court held that a court should not suppress the fruits of a search conducted under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. The Court explained that an officer could not be found to have acted with "objective reasonableness," excluding application of this "good faith exception," in any of the following circumstances:

(1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;"

(2) the magistrate acted as a rubber stamp for the officers and "wholly abandoned" his detached and neutral "judicial role;"

(3) "an affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or

(4) "a warrant [is] so facially deficient - - i.e., in failing to particularize the place to be searched or the things to be seized - - that the executing officers cannot reasonably presume it to be valid."

Id.; see also United States v. Bynum, 293 F.3d 192, 195 (4th Cir. 2002).

The Fourth Circuit explained the contours of the good faith exception:

Under the good faith exception, adopted by the Court in Leon, evidence obtained pursuant to a warrant which is ultimately held invalid need not be excluded as long as the warrant was issued by a detached and neutral magistrate and the executing officers' reliance on the warrant was objectively reasonable. In setting forth this doctrine, the Court noted, searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search.

United States v. Legg, 18 F.3d 240, 243 (4th Cir. 1994) (internal quotation marks and citations omitted).

In Loera, discussed extensively above, the district court concluded that the good-faith exception should apply. United States v. Loera, 923 F.3d 907, 925 (10th Cir. 2019). The appeals

32

court disagreed.  See id.  In so holding, the court determined "that the good faith exception does not apply in a case like the one before us because the illegality at issue stems from unlawful police conduct, rather than magistrate error, and therefore the deterrence purposes of the Fourth Amendment are best served by applying the exclusionary rule."  Id. ("Thus, Leon is inapplicable here where the mistake—the unconstitutional second search—was the fault of the officer, not the magistrate."); see also United States v. Moya, 690 F.3d 944, 948 (8th Cir. 2012) (noting that for Leon good-faith exception to apply, "officer must act with objective good faith and within the scope of the search warrant"); United States v. Andrews, 713 F. Supp. 1319, 1321 (D. Minn. 1989) ("Leon provides a remedy for magistrate errors, not law enforcement dereliction.").

> The rationale for the good faith exception set forth in Leon hinges on the deterrent purpose of the exclusionary rule.  Leon, 468 U.S. at 920-21, 104 S. Ct. 3405.  The exclusionary rule is intended to deter law enforcement officers from conducting unconstitutional searches and seizures.  Id. at 916, 104 S. Ct. 3405.  Exclusion is only capable of deterring officers from conducting unconstitutional searches when officers are responsible for the constitutional error.

United States v. Gray, 302 F. Supp. 2d 646, 652 (S.D.W. Va. 2004) (refusing to apply the good faith exception) (Goodwin, J.).

In this case, the error was not with the warrant itself but, rather, the government's execution of that warrant.  See United States v. Mowatt, 513 F.3d 395, 405 (4th Cir. 2008) ("The Leon

exception does not apply here because <u>Leon</u> only prohibits penalizing officers for their good-faith reliance on magistrates' probable cause determinations."); <u>see also</u> <u>United States v. Fuccillo</u>, 808 F.2d 173, 177 (1st Cir. 1987) ("The good faith exception, therefore, will not be applied unless the officers executing search warrants, at the very minimum, act within the scope of the warrants and abide by their terms.").  Therefore, the good-faith exception is inapplicable.  In any event, the court cannot conclude that the government's actions were taken in good faith.  <u>See</u> <u>United States v. Zimmerman</u>, 277 F.3d 426, 438 (3d Cir. 2002) ("Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble."); <u>United States v. Gallegos-Espinal</u>, Criminal Action H-17-678, 2019 WL 2225025, *18 (S.D. Tex. May 23, 2019) (noting that "[c]ourts should resist the temptation to frequently rest their Fourth Amendment decisions on the safe haven of the good-faith exception, lest the courts fail to give law enforcement and the public the guidance needed to regulate their frequent interactions") (quoting <u>United States v. Molina-Isidoro</u>, 884 F.3d 287, 293 (5th Cir. 2018) (Costa, J., specially concurring)).

## X.        Inevitable Discovery

"The inevitable discovery doctrine may apply where additional routine or factually established investigative steps would inevitably lead to discovery of the evidence without

undertaking any search." <u>United States v. Allen</u>, 159 F.3d 832, 841 (4th Cir. 1998). Of the doctrine's limits, our appeals court has explained:

> But when evidence could not have been discovered without a subsequent search, <u>and</u> no exception to the warrant requirement applies, <u>and</u> no warrant has been obtained, <u>and</u> nothing demonstrates that the police would have obtained a warrant absent the illegal search, the inevitable discovery doctrine has no place. In those circumstances absolutely nothing suggests, let alone proves by a preponderance of the evidence, that the illegally obtained evidence inevitably would have been discovered. The inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents <u>no</u> evidence that the police would have obtained a warrant. Any other rule would emasculate the Fourth Amendment.

<u>Id.</u> at 841-42; <u>see also</u> <u>United States v. Mejia</u>, 69 F.3d 309, 320 (9th Cir. 1995) ("We reject the contention that [the inevitable discovery] doctrine applies where the police had probable cause to conduct a search but simply failed to obtain a warrant. . . . If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be any reason for officers to seek a warrant.").

In <u>Loera</u>, the court ultimately denied defendant's motion to suppress on the basis of the inevitable discovery doctrine. <u>United States v. Loera</u>, 923 F.3d 907, 928 (10th Cir. 2019). In so doing, the court found that the government had shown "by a preponderance of the evidence that the FBI would have inevitably

discovered the child pornography evidence in Loera's electronic devices through lawful means independent" of the illegal search. Id. Of particular importance to the Loera court in concluding the doctrine should apply was the government's showing that probable cause existed to get a warrant as well as the FBI agent's testimony that he would have gotten a warrant. See id. at 928-29.

In this case, the government did not present any evidence to show by a preponderance of the evidence that it had probable cause to obtain a warrant to search Dr. Nasher's records for evidence of health care fraud related to his absences from the office. But even if probable cause did exist for issuance of a second warrant, the government did not present any evidence that it was prepared to seek a second warrant. Under these circumstances, the inevitable discovery doctrine does not apply. See, e.g., United States v. Cobb, Criminal No. 1:18CR33, 2018 WL 4907764, *6 (N.D.W. Va. Oct. 10, 2018) (declining to apply inevitable discovery doctrine where there was no evidence officers would have obtained a search warrant); United States v. Jones, Case No. 3:17cr71, 2018 WL 935396, *15 n.23 (E.D. Va. Feb. 16, 2018) (noting government could not establish by a preponderance of the evidence that evidence would have ultimately been discovered by lawful means where "the officers believed their warrant comported with the Fourth Amendment [and] [n]o

evidence suggests that they were planning to seek another warrant" although ultimately concluding that inevitable discovery doctrine did not govern its analysis); <u>United States v. Cooper</u>, 433 F. Supp. 2d 737, 743 (S.D.W. Va. 2006) ("[A]bsent concrete evidence that the officers would have secured a warrant, the inevitable discovery doctrine does not apply to the illegal search in this case.") (Chambers, J.).

## XI.      Rule 41

Defendant also contends that the government violated Federal Rule of Criminal Procedure 41(e)(2)(B).  That rule provides in part:

> **Warrant Seeking Electronically Stored Information.**
> A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information.  Unless otherwise specified, the warrant authorizes a later review of the media or information <u>consistent with the warrant</u>.

Fed. R. Crim. P. 41(e)(2)(B) (emphasis added).

The court agrees with defendant that the government's second search violated Rule 41(e)(2)(B) because it was not "consistent with the warrant."  As discussed above, the second search was outside the scope of the warrant issued.

## XII.     Conclusion

Based on the foregoing, defendant's motion to suppress was granted.

The Clerk is directed to send a copy of this Memorandum Opinion to counsel of record and to the Probation Office of this court.

IT IS SO ORDERED this 29th day of July, 2019.

ENTER:

David A. Faber
Senior United States District Judge